## PARK BROS. & CO., Limited, v. BUSHNELL.

(Circuit Court of Appeals, Second Circuit. March 12, 1894.)

### No. 69.

**1. TRIAL—EXCEPTIONS TO CHARGE—APPEAL.**

In the federal courts, exceptions to the charge will not be considered on appeal, unless they are definite, and are publicly taken before the jury retires.

**2. MASTER AND SERVANT—RIGHT TO DISCHARGE—INSTRUCTIONS.**

In an action for wrongful discharge, where it appears that the plaintiff was engaged for a long term of years as superintendent of a large and important business, and was constantly obliged to represent the defendant in different states, and to attend with promptness, resoluteness, and good judgment to large pecuniary interests, it is proper to charge the jury that what would justify discharge of a mere clerk or workman might not justify the discharge of one like the plaintiff, and that where a contract has been substantially performed as to time and its most material parts the employer has no right to dismiss an employe for mere disobedience of general orders of a slight character, which involve no serious consequences or danger to the business, unless such disobedience is perverse or unreasonable.

**3. SAME—HARMLESS ERROR.**

An instruction, leaving to the consideration of the jury the question whether plaintiff's disobedience of his employer's definite instructions was material or injurious to the employer, is inconsistent with an instruction that violation of definite instructions is sufficient ground of discharge; but such inconsistency is harmless error where the evidence clearly shows that no definite instructions were violated.

**4. SAME.**

An instruction that, if an employe is competent to discharge his duties, his dismissal is unjustifiable, is not misleading, as withdrawing the jury's attention from other causes for dismissal, where they are also instructed to consider all the evidence as to ill health, absence from business, and failure to obey special instructions; and that if, for any reason, the dismissal was justifiable, the employer is not estopped from setting up such ground of discharge by the fact that the dismissal was not expressly based upon it.

**5. SAME—DISOBEDIENCE TO ORDERS—EVIDENCE.**

An employer telegraphed to his agent to accept an offer to buy 2,000 tons of steel at a certain price, but to give no option for a further amount. The agent, who had general charge of the sales, found that the purchaser had made no such offer, and thereupon agreed to sell him 2,400 tons at the stated price. *Held*, that he had not disobeyed orders, since the telegram did not limit the amount to be sold.

In Error to the Circuit Court of the United States for the Southern District of New York.

Action by Robert G. Bushnell against Park Bros. & Co., Limited. Plaintiff obtained judgment. Defendant brings error.

Joseph H. Choate, for plaintiff in error.

John E. Parsons, for defendant in error.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. This is an action at law, which was originally brought in the supreme court of the state of New York, by Robert G. Bushnell against Park Bros. & Co., Limited, and,

upon the petition of the defendant, was removed to the circuit court for the southern district of New York. The action was to recover the unpaid contract price which accrued before and after the plaintiff's discharge from the service of the defendant for the period of, time during which the defendant had agreed to employ him. The verdict of the jury was in favor of the plaintiff for $71,587.33 and interest. A bill of exceptions having been settled and allowed, and judgment having been entered, the defendant brought the cause to this court by writ of error.

The defendant is a large manufacturer of steel. The plaintiff was an exceedingly competent and successful salesman, and superintendent of agencies for the sales of steel. He had been in business with the firm which subsequently became the defendant corporation from December, 1861, to December, 1879, when he became a member of another firm, and so continued until September, 1884. On September 30, 1884, the defendant, by written agreement, employed his whole time for a period of six years, beginning August 1, 1884, at a salary of $8,000 per annum, payable monthly, and, in addition, a commission of 4 per cent. on the annual net profits of the entire business of the defendant, payable on demand, after the result of the year should be ascertained. His business was to sell the plaintiff's steel, and to be its superintendent of agencies in the eastern district, which included the territory east of the Alleghany mountains and north of Washington, but only that part of the state of New York east of Syracuse. On December 28, 1887, the defendant notified Bushnell that on account of his ill health the contract would cease after January 1, 1888. He remonstrated, and on January 20, 1888, the defendant proposed a reduction of the commission to 2 per cent. of the net profits. He declined, and on February 3, 1888, the defendant agreed to go on with the old contract. About this time—perhaps a little before—it relieved him of the Philadelphia business, and placed him at the head of the business of the New York house. On November 19, 1888, the defendant notified him that the contract must be terminated for violation of orders, alleged to be explicit and peremptory, in regard to a sale of 2,000 tons of steel to Shuler & Co. This transaction will hereafter be more particularly stated. Correspondence ensued, and on December 1, 1888, he was dismissed, and in September, 1890, he brought suit against the defendant, in which he claimed the balance of the agreed compensation from December 12, 1888, to the end of the contract period. The defendant, by its counsel, pleaded that the discharge was for cause, and alleged as causes the plaintiff's inattention to business, inefficiency, repeated disobedience of orders, among which it alleged his failure to obey the order of the defendant to make daily reports of its business in his charge to the home office in Pittsburgh, and his disobedience of explicit instructions in the matter of the Shuler sale.

At the close of the trial, which lasted 11 days, and in which divers important and unimportant issues were presented, the defendant made 74 requests to charge. At the close of the charge the defendant's counsel took sundry exceptions, and said that, after

he had received the charge from the stenographer, he would make them more specific. The plaintiff's counsel acquiesced in this suggestion, but the court made no expression of its views. Thereupon, after the verdict of the jury, and after the stenographer's minutes were written out, the defendant's counsel stated 13 additional specific exceptions. The rule in the federal courts is explicit that all exceptions to the charge of the jury must be definite, and not general, and must be publicly taken before the jury retires. The reason is obvious, and is that, the charge having been made for the instruction of the jury, the judge has the right, upon his attention being called to any misstatement or error in the charge, to explain, modify, or withdraw any portion which he deems vague, erroneous, or liable to mislead. Counsel are not to be permitted, especially after having laid the foundation for exceptions by an inordinate number of written requests, to prevent an opportunity for explanation of the several sentences of a charge, and to postpone explicit exceptions, either for the purposes of a microscopic investigation, or to turn an exception, which had neither meaning nor validity into one which is believed to have importance, or to amplify general into particular exceptions to the different sentences of a charge. The practice which was attempted is one which tends to inexactness of counsel at the time of the charge, is a temptation to subsequent controversy, and possibly unfairness of dealing, and should not receive the favor of counsel or court. No exception will be examined in this case which was not taken in conformity with the foregoing customary rules of the federal court.

In this case the alleged disobedience was of two classes,—one of disobedience of general orders in regard to the general conduct of a large and important business, and the other of disobedience of specific orders in regard to a particular sale. One of the defendant's requests was as follows:

"That refusing to obey the reasonable orders of the defendant was a good ground for dismissal from service, for in every contract of hiring there is an implied contract on the part of the servant that he will obey the lawful and reasonable commands of his master."

It is manifest that the relations of Bushnell to the defendant were not those of a menial or domestic servant to his master. He was the superintendent of a large and important business for a long term, was constantly obliged to be the representative of the defendant in different states, and to attend with promptness, resoluteness, and good judgment to its large pecuniary interests. The judge, in view of these considerations, charged that what would justify the rescission of a contract for employment in the case of a mere workman or clerk might not justify it in the case of a person whose duties were of such a character as those which were intrusted to the plaintiff; and also that—

"Under the contract the plaintiff became the agent or servant of the defendant corporation. It had a right to direct him as to his duties in the conduct of his business, and, so far as those directions were reasonable and lawful, the plaintiff was bound to obey them."

And further charged as follows:

"Disobedience of the reasonable orders of an employer is good ground for such discharge where such disobedience is material; that is, where serious danger is occasioned to the business of the employer by the conduct of the servant, even where no resulting loss can be shown. But where a contract has been substantially performed as to time, and its most material parts, the employer has no right to dismiss an employe for a mere disobedience of orders of a slight character, which involve no serious consequences or danger to the business, unless such disobedience is perverse or unreasonable."

This sentence of the charge was duly excepted to. The judge was here referring to general orders relating to the general conduct of business of a character like that of the plaintiff. The defendant's request covered any disobedience of any reasonable orders, and called for an instruction that any such disobedience was a good ground for dismissal. The judge properly qualified the too broad and sweeping statement which the defendant desired, and added to it the just limitations which the character of the service required. It is impossible to state a perfectly definite and exact rule which shall be applicable to all the varied cases of master and servant. A rule which might be perfectly applicable to the precision with which a coachman or gardener should be required to obey the directions of his master or mistress in regard to the details of the service which involved the comfort of the household, might be inapplicable to the case of exact compliance by a manager of a large factory with a general rule which required him to render daily memoranda of his business life for the inspection of the directors. The rule which the judge announced was sufficiently exact, was properly guarded, and is clearly sustained by adequate authority. Turner v. Kouwenhoven, 100 N. Y. 115, 2 N. E. 637; Shaver v. Ingham, 58 Mich. 649, 26 N. W. 162. The jury manifestly and properly found under the statement of the law that there was no substantial violation of the defendant's rule which called upon the plaintiff to write daily letters to the home office.

The second charge of disobedience was of a different character. Davis W. Shuler & Sons were large spring manufacturers in Amsterdam, N. Y. In 1887–88 the defendant supplied them entirely with spring steel, and in June, 1887, Mr. Park, the president, wrote to Bushnell he hoped he (Bushnell) could soon arrange something with Shuler; that he (Park) wanted their whole trade; that a portion would be only moderately satisfactory to him. In the autumn of 1888 a new contract was to be made. Verbal negotiations were had between Shuler and Bushnell and between the two and Park in the latter part of October, which resulted in nothing. On November 7th plaintiff telegraphed to defendant:

"Shuler expects to see me in Amsterdam not later than Thursday. Please send me early mail or wire your final wish in the matter, so that I may know how to act intelligently."

On the same day defendant writes to plaintiff:

"Referring to the Shuler matter, would say we do not think there is any necessity for hurry, and you had better postpone seeing them until Monday. We do not think we will do any better than the proposition made by the writer."

That proposition is unknown. On November 9th plaintiff tele-graphed to defendant:

"Please write to-day to [meaning about] Shuler, as I must receive it to-morrow. Expect to be in Amsterdam Monday, early."

On November 9th defendant wrote to plaintiff, speaking of the Shuler matter:

"We wish you now to make sure a proposition for one thousand or twelve hundred tons, to be delivered between now and July 1st, at 2.20, less 3 per cent. discount for cash, delivered. If they wish to buy 1,000 or 1,200 tons more for the latter part of the year, we will accept it at 2.30, less 3 per cent. discount, delivered. * * * We make this offer subject to decision after your visit Monday. Don't leave it open."

On November 10th plaintiff saw Shuler in New York, and wrote to defendant:

"Mr. Shuler is here, and positively declines to arrange with us for a supply of steel where deliveries are limited to July next, and also refuses to purchase at a higher price for the last six months of 1889. * * * Messrs. Shuler are willing to close with us for a specified quantity, say 2,000 tons, to be furnished during the year 1889, monthly deliveries, to be not less than 175 nor more than 225 net tons per month, at 2.20c. per pound, note four months, or subject to 3 per cent. discount for cash in 30 days, delivered. * * * Messrs. Shuler & Sons say they cannot delay this matter any longer, and, if you are unwilling to close on this basis, must and will make other arrangements at once. I have promised to give them a definite reply at Amsterdam on Monday morning next, and will expect final telegraphic instructions from you there, care Hotel Brunswick, at that time. Messrs. S. & Sons feel that we should be willing to give them an option for an additional quantity of steel, provided that their business during this period actually requires it; such option not to exceed 250 tons. This request for option is not, however, positively imposed."

This letter closes with request that defendant wire instructions on receipt of letter. Defendant telegraphed on November 12th to the plaintiff at Hotel Brunswick, Amsterdam:

"Take Shuler's offer for 2,000 tons for whole year, monthly delivery as named, at 2.20, usual terms, but give no option for further amount."

On November 12th, Bushnell went to Amsterdam. The Shulers said he had misunderstood their proposition, and that they could get the steel at less than 2¼ cents per pound. Bushnell made a contract with them for 2,400 tons for the year, at monthly deliveries of not less than 175 nor more than 240 tons per month, at 2.20 cents per pound, on the usual terms, and gave no option. He also agreed that he would personally pay them a rebate of 18 cents per ton if the defendant did not agree to make this concession. The contract was for $105,000. This rebate amounted to $432. The defendant did not agree to this concession, and was paid the full contract price. In January, 1889, Shuler offered to cancel the 400 tons of the contract, but Mr. Park declined. The whole quantity was delivered. On November 16, 1888, the defendant wrote the Shulers, "We are very glad to have closed contract with you for next year;" and on November 19, 1888, wrote to Bushnell that his disregard of their orders was flagrant, and that his connection with the company must terminate.

In regard to the Shuler transaction, the judge charged that, under the instructions of the telegram, plaintiff was limited to the maxi-

mum amount of 2,000 tons, and to a minimum price of 2.20 cents per pound, provided Shuler & Co., on their part, were ready to stand by their offer.  He further charged:

"And if the correspondence between defendant and plaintiff prior to the Shuler sale resulted in definite instructions to plaintiff by defendant as to price or quantity to be adhered to in negotiating with Shuler, such instructions were binding upon plaintiff; and their binding nature was not to be impaired by any belief on plaintiff's part that he had been previously intrusted with discretionary power as to the prices and quantity of his sales generally.  Where a salesman understands that he has a general authority to fix the price and quantity of his sales, he cannot allow such understanding to conflict with his employer's express instructions as to the price or quantity of any particular sale.  If you should be of the opinion that the Shuler sale violated positive instructions of the defendant, it is proper for you to consider whether it was an effort on the part of the plaintiff to carry out, even if erroneously, the instructions and authority which he supposed he had from the defendant, or was a willful disobedience of positive instructions.  But this evidence is only admissible for the purpose just stated.  It is not admissible as a justification of such violation of instructions, for an employer may dismiss an employe who fails to follow directions because he thinks another course proper, or more to the employer's interest."

He also charged:

"But the defendant's telegram of November 12, 1888: 'Take Shuler's offer of two thousand tons for whole year, monthly delivery as named, at two-twenty, usual terms, but give no option for further amount,'—did not of itself preclude the plaintiff from making a sale to Shuler, if, when he reached Amsterdam, he could not procure Shuler to make such an offer as the telegram referred to.  So far as giving an option, the telegram constituted a positive limitation from the defendant.  In no other respect did it constitute a positive limitation if Shuler's offer was not maintained."

These portions of the charge were duly excepted to.  There can be no objection to the statement that the telegram, by itself, and without reference to any other correspondence, did not of itself preclude Bushnell from making a sale of more than 2,000 tons if Shuler's supposed offer was not adhered to, or had not been made.  The residue of the paragraphs are to the effect that, if Bushnell had received definite instructions respecting the Shuler sale, they were to be adhered to, without reference to any general discretionary powers, and without reference to the agent's opinion that another course would conduce to his employer's interest; and that a mistake in supposing he had general instructions, rather than a willful disobedience of positive instructions, is not admissible as a justification of a violation of the latter instructions.  In other words, he charged that a salesman must obey the definite and positive instructions of his employer in regard to the terms and amount of a proposed sale, and that disobedience of such instructions justifies a discharge.  The charge in these respects was correct.  The remark in regard to a consideration whether the Shuler sale was caused by an error in regard to the extent of the agent's authority or by willful disobedience would have been misleading if it had not been followed by the declaration that evidence of that sort was not admissible as a justification of the violation of positive instructions.  The attention of the jury was adequately called to the fatal consequences of a disregard of positive instructions in regard to a particular sale.

The judge also charged that, while subsequent obedience by Bush-

nell, or the subsequent reduction or attempted reduction of the 400 tons, could not of itself effect a rescission of the plaintiff's discharge, or entitle him to recover, yet the fact that the defendant made the statement in his letter of November 16th to Shuler, and declined to take advantage of the plaintiff's offer to get the contract altered, was proper conduct to be considered upon the question whether disobedience (if the jury found that plaintiff was disobedient) was material or injurious to the plaintiff. This was excepted to by the defendant. Its language was inconsistent with the previous part of the charge, in which he had told the jury, in substance, that violation of definite instructions was a sufficient ground for a discharge. The violation by a salesman or superintendent of his employer's definite and positive instructions in regard to the terms or amount of a particular pending sale of merchandise is adequate cause for discharge, and the question of the extent of the injury to the employer is immaterial. This presupposes that the violation is not of such slight character as to make the maxim "de minimis non curat lex" applicable.

This inconsistency and consequent error in the charge would require a new trial if the correspondence between the parties had created positive and definite instructions, or if the question of the character of the instructions was such that it must necessarily be left to the jury. It is true that not infrequently the meaning of commercial instruments and the "true interpretation of mercantile phrases in such instruments or orders is not always a question of law, but may in many cases be properly left to a jury to decide when the phrases admit of different meanings" (Story, Ag. § 75); but in this case the instructions were written, and the interpretation is not dependent upon conflicting testimony as to usage or the practice of the parties. We assume that the testimony on both sides supports the defendant's position that it established the minimum price upon this class of steel, and that the plaintiff was to make the best attainable contracts in accordance with the known prices and wishes of his employer. It is also plain that the employer was urgent that the agent should complete contracts in accordance with established prices, and not leave them unfinished, and the co-contracting party open to the solicitations of a competitor. The judge who tried the cause could properly have construed the correspondence. An examination of it will clearly show the state of the negotiations. On November 9th the defendant informed Bushnell that negotiations were pending between a competitor and the Shulers for all their business at 2 1-8 cents per pound, and that it wished him to make sure a proposition for 1,000 or 1,200 tons, to be delivered before July 1st, at 02.20 per pound, and, if 1,200 tons more were wanted in the latter half of the year, they would accept on that an offer of 02.30. This offer was to be subject to decision on the following Monday, and not afterwards. It was refused on November 10th. The defendant was forthwith informed of the refusal, and of the offer of the Shulers to take a specified quantity, say 2,000 tons, deliverable in 1889, at 02.20, in monthly deliveries of not less than 175 tons; and of the belief of Bushnell that accept-

ance of this offer was important. On November 12th the defendant telegraphed, "Take Shuler's offer of 2,000 tons, but give no option for further amount." When Bushnell saw the Shulers, he found himself in this position: The defendant's offer had been rejected, and the offer of the Shulers which he was instructed to take did not exist. The defendant had told him to take the offer for the specified quantity of 2,000 tons at the offered price, but to give no option. He was not told to sell no more that 2,000 tons, but he was instructed to accept a supposed offer for that amount. The telegram gave no instructions in the event that the Shulers had changed their views, and the existing circumstances on November 12th were not met by instructions adapted thereto. Bushnell made a contract at the price accepted by the defendant. His personal agreement to pay a rebate did not change the price so far as the defendant was concerned. He did agree to sell 2,400 tons, an amount which the defendant had already said it was willing to furnish. The question thus simply relates to positive and specific instructions in the telegram respecting the number of tons. The construction of the defendant is that it meant "take the offer for 2,000 tons, and no more." The language of the telegram does not compel or require that construction, and did not require Bushnell to stop negotiating, unless the Shulers would purchase only 2,000 tons. He made the contract in pursuance of the general duties which were intrusted to him, and not in excess of any expressed instructions. Mr. Park says that the company permitted the agents to exercise no discretion in going below the prices, or in selling in excess of the quantity, which it had named. Bushnell obtained its price, for the personal promise which he made to pay $432 was known not to be a promise as agent or to be binding upon the corporation; and the limitation in regard to quantity is not to be found, unless the words "and no more" or "only" are to be read into the telegram after the words "2,000 tons."

Our conclusion is that there was nothing in this transaction which afforded any legal justification to the defendant in terminating its contract with the plaintiff, and that the trial judge should have informed the jury that the plaintiff had complied with his instructions, and that there was nothing in his conduct in the Shuler transaction of which the defendant had any right to complain. We think that, upon the face of the correspondence between the defendant and the plaintiff, he was authorized to make such a contract with Shuler & Sons as he did make, and that there was no express or implied limitation in his instructions which confined him to selling them only 2,000 tons, and that there was no departure from the instructions in respect to the price. He had no reason to suppose the defendant would be unwilling to sell Shuler & Sons 2,400 tons of steel. They had not proposed for that quantity and been refused. On the other hand, the defendant had requested plaintiff to procure an order from them for 2,400 tons, deliverable during the year. As the situation existed, and according to the rational construction of the correspondence which had taken place, the plaintiff had a right to understand that he was authorized to

sell Shuler & Sons a specific quantity, certainly 2,400 tons, and that the only limitation upon his discretion was in regard to price, and an option for an uncertain quantity. The defendant had asked plaintiff to get an order from Shuler & Sons for 2,400 tons, deliverable during the year,—1,200 tons before July, 1,200 tons after,—and naming the price. The plaintiff had replied that Shuler & Sons would not give such an order, but were willing to take a specified quantity at a lower price, and wanted an option for more if they should need it. The plaintiff did not write that Shuler & Sons were willing to buy 2,000 tons, but wrote that they would take approximately that quantity, "say two thousand tons." His letter stated that they would require at least 175 tons per month. It is absurd to suppose that defendant did not understand that Shuler & Sons required at least 2,100 tons during the year. The telegram directed him to accept the proposition of Shuler & Sons without the option. While it told him to take their proposition for the 2,000 tons, it also told him he might contract with them for monthly deliveries which would amount to a larger quantity. The final instructions which the plaintiff asked for and had received did not meet the situation. He was left in a situation where his own discretion was his only guide. The case is one for the application of the rule that, where instructions are ambiguous, and the agent acts bona fide in accordance with an interpretation of which they are susceptible, although they may also be susceptible of a different one, it is not competent for the principal to assert as against the agent that the act was unauthorized, because he meant the instructions to be understood in the other sense.

The defendant requested an instruction to the jury that "an employe who, for any cause, becomes incapable of performing his duties faithfully and efficiently, may be dismissed." The court so charged, and added, "If he was competent to discharge his duties, then his dismissal was unjustifiable." To this defendant excepted, and it is urged that the court erred because it places the plaintiff's right to a verdict solely upon the question of competency, and that he ought also to have submitted to the jury the question of shiftlessness or inattention to duty, or neglect of duty through sickness or other cause. The objection is not well founded, for the judge also charged as follows:

"You are not to consider the evidence piecemeal, but to take as a whole the evidence as to ill health, absence from business, neglect of duties, failure to comply with special instructions, and lack of success in the business, together with all evidence contradicting this evidence, and all other evidence which may bear upon the question of plaintiff's capacity, at the time of his discharge, to fill his position properly. If you find that for any reason the dismissal was justifiable, the employer is not estopped from setting up such ground of discharge, although it may not be the ground alleged at the time of dismissal, unless such ground of discharge has already been condoned."

The defendant requested the court to charge that, if the defendant improperly discharged the plaintiff, then his failure to seek other similar employment (if he failed so to do) was a breach of an active duty which he owes to the defendant, and was a fraud upon the defendant; and for a refusal to charge in the language of this re-

quest an exception was duly taken. The court thereupon properly charged, in conformity with Howard v. Daly, 61 N. Y. 362, and Costigan v. Railroad Co., 2 Denio, 609, that the plaintiff's duty (if he was improperly discharged) was to use prompt and reasonable diligence to procure other employment of a similar character, and thus reduce the damages; and that, if the jury found that the plaintiff did not conform to this duty, they could mitigate the damages to the extent of the compensation which he might have received by proper effort in seeking employment. Upon the whole case, we think that no error of law was committed whereby the defendant was prejudiced, and the judgment is affirmed.