**AHTO WALTER, Plaintiff**
**v.**
**NETHERLANDS MEAD, N.V., et al., Defendants**

Civil No. 284-1963

District Court of the Virgin Islands

Div. of St. Thomas and St. John

March 27, 1973

441

THOMAS D. IRELAND, ESQ., St. Thomas, V.I., *for plaintiff*

BAILEY, WOOD & ROSENBERG, ESQS. (ATTORNEY WILLIAM W. BAILEY, of counsel), St. Thomas, V.I., *for defendant*

CHRISTIAN, *Chief Judge*

### MEMORANDUM

In this action, styled in debt, plaintiff seeks to recover the total sum of $325,552.00 from defendant, claimed to be due plaintiff as (a) salary under the terms of an allegedly breached contract of employment and (b) participating interest on the net income of defendant in a certain specified venture, together with his costs and reasonable attorney's fees.[1] Defendant by its answer and the defenses set forth therein, in effect denied the indebtedness. (Except as to its calculation of the amount due for the de-

---

[1] The action, though commenced on September 20, 1963, did not come to trial until January 10, 1970. After four consecutive days of hearing, the cause was adjourned until February 10 and 11, when it was finally concluded. Post trial briefs were ordered but it was agreed that the time within which they were to be prepared and submitted would not commence to run until after a transcript of the testimony had been prepared and filed. For valid reasons the transcript (six volumes) could not be completed until January, 1971. Considerable leeway had to be allowed counsel for reading the transcript and preparing of briefs. This time was duplicated by the Court's reading of the transcript and examination of the unusually large number of exhibits. Further time was lost due to the Court's illness. For all the foregoing, the Court is grateful to all, the parties in particular, for their patience and indulgence.

bentures). It also levelled ten counterclaims against plaintiff.[2] As to the counterclaims numbered "Second", "Sixth", "Eighth" and "Ninth", it was conceded that they should fall for failure of proof. The others, in their chronological order, sought to recover $38,377.21 as reimbursement for alleged unauthorized withdrawals; $250,000.00, damages growing out of a claimed breach of the non-competition clause of the parties' employment agreement, the setting up and sale of a competing supermarket and the hauling of freight on the Santo Antonio, for the supermarket without charge; $5,000.00 damages for allegedly refusing to deliver books, records, papers, etc.; $25,000.00 for use of Mead's funds for office rent and office equipment, the latter supposedly retained by plaintiff; for loss of income and profits by reason of plaintiff's charged malicious conduct in the amount of $100,000.00; and lastly $28,946.02 as damages for plaintiff's negligent performance of his duties in permitting the Santo Antonio's condition to deteriorate. By agreement of the parties, the case was tried to the Court sitting without a jury.

The plaintiff was represented by Thomas D. Ireland, Esquire. The defendant was represented by BAILEY, WOOD & ROSENBERG (Messers. Bailey and Rosenberg, of counsel).

The Court having heard and considered the evidence adduced, and having read and considered the briefs submitted on behalf of the parties, now makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

---

[2] Originally one W. M. O'Neil, who eventually became owner of all the capital stock of Mead, and later, through that corporation, came to exercise control over Walter Quick Freeze when Mead acquired the controlling interest in Walter Quick Freeze, was named as a defendant. The claim against him was later dismissed pursuant to Rule 12(b)(6), Fed. R. Civ. P.

Plaintiff, AHTO WALTER (Walter) is, and at all times pertinent hereto was, a resident of St. Thomas, U.S. Virgin Islands. Defendant, NETHERLANDS MEAD, N/V (Mead) was at all relevant times a Netherland Antilles Corporation.

Walter, through Walter Quick Freeze Corporation (WQF), a closed corporation which he had organized, and of which he was, at the outset, the principal stockholder, established and owned Lucy's Grocery Markets in St. Thomas, Virgin Islands. This was during the 1950's. By dint of training and experience over the many earlier years, Walter was thoroughly knowledgeable in the area of shipping, and for that matter, in shipbuilding.

In 1959, Walter, on behalf of WQF, arranged the purchase of the motor vessel, Santo Antonio. However, by virtue of an arrangement made with his close personal friend, one R. S. Reynolds, the purchase was consummated by Mead, then wholly owned and controlled by Reynolds. Apparently in return for the purchase of the vessel by Mead, WQF, on January 1, 1960, entered into a "Shipping Requirements Agreement" with defendant Mead.

Under the provisions of the shipping agreement, the term of which was ten years, Mead and WQF agreed that all cargo brought into the Virgin Islands by WQF was to be shipped via the Santo Antonio. WQF was to be a highly preferred and indeed the chief customer of Mead's "Shipping Division." The Santo Antonio could accept other freight only if there was space over and above WQF's needs and if the acceptance and delivery of such cargo would not cause delay in deliveries for WQF. Additional obligations assumed by WQF were, a guarantee to meet the deficiency in any month that operating expenses exceeded freight charges and a further guarantee of minimum gross

revenues of $180,000 for 1960 and $216,000 in 1961, and the subsequent years of the agreement. Additionally, WQF undertook to pay to Mead, "as additional freight", 50% of its net profits in each of the years of the agreement. Mead, on the other hand, covenanted to favor WQF with relatively low freight rates and to meet all of WQF's shipping requirements so long as WQF gave advance notice of its needs, sufficient to permit the efficient and economical scheduling of the movements of the Santo Antonio. The foundation stone of these intricate arrangements was the underlying personal relationship between Reynolds and Walter, between whom there was highest confidence and respect, and who counted on the venture to succeed primarily because of this mutual esteem. Thus it was that WQF held an option to purchase the Santo Antonio in the event of Reynold's death or the termination of his ownership of Mead. By the same token Mead could terminate the agreement upon Walter's death.

Simultaneously with the execution of the shipping agreement, a ten-year Employment Agreement was entered into by Mead and Walter. By the terms of this agreement Walter was to serve as managing director of defendant's shipping division, the Santo Antonio operations being the sole business of the division. That contract provided that Walter was to have "sole responsibility for the management of the Shipping Division and shall report, as required, to a committee appointed by the Board of Directors of Employer for its Shipping Division." Walter was to receive $12,000 per year for his services, subject to stated contingencies which might cause his stipend to move up or down. He could be removed from his position for cause only. The contract of employment contained non-competition and exclusive employment clauses, running against Walter.

447

In conjunction with his employment agreement Walter purchased eight profit sharing debentures of Mead at a face value of $1000 each. The debentures entitled him to a total of 32.2% of the annual net profits of the shipping division (4.4% per debenture per year). Mead reserved the right to redeem them at face value plus interest if, for any reason, Walter's association with the shipping division ceased. Redemption of the debentures required the sending of notice thereof to the holder's registered address accompanied by payment in full.

For approximately two years Walter pursued his dual tasks as manager of WQF as well as Mead's shipping division. As time went by the working relationship was complicated in practice by steadily increasing clashes between Walter and officials, stockholders and employees of the two companies. The bone of contention was Walter's authority and responsibility. Things took a turn for the worse when Walter, by virtue of a sale of some of his stock late in 1961, lost control of WQF.

In January of 1962, Walter was dismissed as manager of WQF. Since he had run both jobs out of his WQF offices, he transferred the shipping division's business to his home, at first, and later rented office space in Palm Passage, St. Thomas, Virgin Islands, for the conduct of the business growing out of the Santo Antonio operations.

On November 8, 1962, the directors of Mead wrote to Walter requesting that he transfer all funds maintained by him in St. Thomas for account of the Santo Antonio in excess of $15,000 to a Miami account. By letter of November 16, 1962, Walter declined to comply. He justified his refusal on the grounds that $15,000 would provide too small a margin for the prudent operation of the vessel and that he lacked confidence in the directors of Mead, and therefore, felt compelled to keep an adequate amount of funds on hand to guarantee payment of accrued deben-

ture earnings to him at year's end. Repeated requests, variously phrased, went unheeded until July 1963, when plaintiff made a substantial transferral of money to Miami.

In about November of 1962, Walter conceived of the idea of erecting a modern supermarket to replace one or more of the what he considered to be, obsolete markets being operated by WQF. For this purpose he entered into a lease agreement with the West India Co., Ltd. on December 1, 1962, and thereafter commenced the construction of the market. His motive in undertaking this venture was to salvage his still substantial investment in WQF, which he was persuaded was going "downhill". He proposed to save WQF by presenting his plan, with the new market completed, to O'Neil.

O'Neil had, by January, 1963, acquired full ownership of Mead. He was then president of WQF. By May, 1963, O'Neil, through Mead, had the controlling interest of WQF, in exchange for satisfaction of a $180,000 debt due Mead, plus a $20,000 freight credit. Thus, by the middle of 1963, Reynolds, Walter's trusted friend, was effectively out of the picture. Any basis in camaraderie for the 1960 agreements had vanished.

Plaintiff continued with the construction of his market without word to defendant or anyone connected with it. On August 12, 1963, O'Neil and Walter met (at Walter's instance, I gather) on the gallery of the Grand Hotel. There they discussed the ship operations, Walter's new market, and his plans therefor. By this time, and from perhaps as early as May, 1963, O'Neil had been considering discharging Walter. Nonetheless, the Grand Hotel meeting went smoothly. Walter laid bare his plans and aspirations and O'Neil appeared to receive them with favor, to the extent that two handwritten memoranda were prepared and signed by the two men. One of them provided for "buying out" Walter and his leasehold in the event his pro-

posal for future management and operations of WQF business were not found acceptable. The other envisaged the continuing operation of the shipping division by Walter under the then current terms except that Walter's six debentures[3] would be retired at a figure to be determined after the September, 1963 trip of the Santo Antonio, with Walter to receive some 30% of the ship's net earnings thereafter. While Walter saw these writings as firm contracts, made more so by a handshake, O'Neil viewed them to be as flimsy as the paper (luncheon napkins) on which they were written. Within the fortnight a letter from him to Walter made this clear. Further negotiations either were not taken or if attempted did not prosper. No formal document embodying the memoranda was ever signed.

By cable and letter of on or about September 10, 1963, plaintiff was discharged as manager of the shipping division. Thereafter, on October 4, 1963, Walter sold his leasehold and improvements thereon to Pueblo Supermarkets of Puerto Rico (Pueblo).

On October 19, 1963, Mead wrote to Walter advising of its election to redeem his debentures, tendering its check for their face value plus interest as of December, 1962 less an amount claimed to be due it for unexplained expenditures of its funds by Walter. Walter, contending that the attempted redemption was ineffectual, declined to accept tender and eventually commenced this suit.

It can fairly be said of all the foregoing that they are indisputably established in the record. No discussion of them is required or needful. I pass on then to hotly contested issues on the resolution of which the decisions to be made in this case turn. My conclusions of law are stated in the discussion which follows.

---

[3] He had earlier sold two of his original eight to O'Neil.

## THE TERMINATION OF PLAINTIFF'S EMPLOYMENT

 Ahto Walter's discharge is certainly the vortex of all the conflicting charges in this litigation. A prefatory note is therefor in order, i.e. an employer need have but one valid reason in order to properly discharge an employee for cause. Moreover, it is not necessary that the employer be aware of an infraction which justifies dismissal at the time of the discharge. Upon a material breach of an employment contract, an employee may be properly terminated without regard to the adequacy of the reason stated. Restatement of Contracts § 278 (see particularly Illustration 1); Lobriko v. Wyman, 290 F.2d 12 (3 Cir. 1923).

The alleged failure of Walter to follow orders takes two forms—failure to report and failure to transmit funds on demand. In dealing with these charges it should be kept clearly in mind that Walter, as Manager of the shipping division cannot be equated with an ordinary employee. The title "manager" necessarily imports general authority to perform all reasonable functions in conducting the usual and customary business of the organization or firm. This is especially true where, as here, Walter, by virtue of his employment contract had greatly expanded authority and responsibility. He would, nonetheless, be expected to give due regard to requests or inquiries relative to operation or income of the business.

In retaining Walter as "Managing Director" of its Shipping Division, Mead gave him "sole responsibility for the management" of it. Walter was directed to "report as required, to a committee appointed by the Board of Directors of the Employer for its Shipping Division." The very designation "Managing Director" in itself suggests that he was intended to exercise general oversight of Mead's shipping affairs, for the term has well established significance between mere employees and superior personnel with

451

added authority to act for the employer, and concomitant responsibility for such conduct; e.g. Petition of Canadian Pacific Ry. Co., 278 F. 180 (D.C.N.D. Wash. 1921); California Shipbuilding Corporation v. Industrial Accident Commission, et al., 148 P.2d 432 (Dist.Ct. of App., Cal. 1944). Thus plaintiff's response to proffered instructions cannot be evaluated strictly under common law principles of master and servant; his position cannot be so narrowly defined. Further, inasmuch as his employment contract sets out only one condition to his authority—that he "report, as required, to a committee appointed by the Board" —any additional conditions must be clearly suggested by the circumstances of his employment.

■■ Plaintiff, as indicated above, was to report to a "committee appointed by the Board of Directors of the Employer for its Shipping Division," but no such committee was ever formally appointed. Instead, the parties treated the Board and the proposed committee as synonymous. However, under § 463 of the Restatement of Contracts, where performance under a contract is impossible only in part, due to the failure of an essential thing to come into existence as expected, and yet "performance of the whole contract is possible with only an unsubstantial variation, the promisor is under a duty to render performance with that variation." In this instance, it appears that the Board did act in place of a formally designated committee, not only to receive Walter's reports, but also to fix his salary. Such a substitution, while rendering complete performance under the precise terms of the contract impossible, did not constitute a substantial or burdensome variation. On the contrary, all parties evidently accepted the unwritten substitution without objection. More precisely, the Board acted for the proposed committee in some respects, and other mechanisms were adopted in the same informal manner to supplement the Board's super-

452

vision—including the services of a company accountant to whom plaintiff submitted financial reports after each voyage, and who, in turn, forwarded reports to the company offices in Curacao. This arrangement was approved by the Board. In view of this substitution under the contract, it clearly appears that Walter's duty to report was rendered less a formal requirement in favor of more practical results. Realistically, his procedure of filing financial reports with the company accountant after each voyage, including cancelled checks, bills of lading, and so on, certainly was the equivalent of the original reporting requirement in practical import, and I find that in this respect plaintiff's performance was adequate.[4]

■ Ahto Walter, however, was obligated, although not by explicit contractual command, to obey the directions of his employer, insofar as those directions were not inconsistent with the terms of his written contract, 9 Williston on Contracts, § 1013B, Third Edition. Mead charges that his failure to relinquish company funds upon request constituted a violation of that obligation. Both the duty to remit the funds, and the mandatory tone of the request to do so, however, are disputed by Walter. Plaintiff contends that the contract granted him broad discretionary powers to operate Mead's shipping, and pursuant to that grant he was free to disregard orders to transmit funds if, in his opinion, those funds were necessary to the reasonable and prudent operation of the division. He insists that he was of that opinion at the time when he declined to forward the requested funds, and accordingly his de-

---

[4] The reports which the company accountant sent monthly to Mead's headquarters can certainly be deemed reports from Walter. They contained all the pertinent information which Walter had both as to ship's operation, itinerary (even if after the fact) and all financial information regarding the ship. As to other requests, e.g. advance notice of scheduling, I accept Walter's explanation that in the circumstances this was not possible. Moreover, I doubt whether the Board could dictate to Walter in the matter of the scheduling of the ship's voyages.

cision was justifiable and could not render him subject to discharge. Park Bros. & Co. Ltd. v. Bushnell, 60 F. 583 (2 Cir. 1894), an old but quite similar case, provides invaluable insight and guidance in this aspect of Walter's situation.

■ In Park Bros. & Co. Ltd., the second circuit distinguished between two types of orders allegedly disobeyed—general and specific orders—and it laid down two tests. As to the former the Court opined that refusal to obey a reasonable order was not, as a matter of law, ground for dismissal. The Court explained. "It is manifest that the relations of Bushnell [the employee] to the defendant were not those of a menial or domestic servant to his master. He was the superintendent of a large and important business for a long term, and constantly obliged to be the representative of the defendant in different states, and to attend with promptness, resoluteness, and good judgment to its large pecuniary interests. The judge, in view of those considerations, charged that what would justify the rescission of a contract for employment in the case of a mere workman or clerk might not justify it in the case of a person whose duties were of such a character as those which were intrusted to the plaintiff . . . ." (60 F. at 585).

However, the Court emphasized that disobedience of a specific order was of a "different character", and applied a stricter test. As to such a violation of orders, the Court stated: "The violation by a salesman or superintendent of his employer's definite and positive instructions in regard to the terms or amount of a particular pending sale of merchandise is adequate cause for discharge . . . ." (p. 589) and the Court noted that it was error for the trial court to permit the jury to consider the extent of injury to the employer or the employee's

subsequent obedience of the original order, in mitigation of the disobedience (p. 589).

■ Applying the Bushnell test to defendant's requests of plaintiff to forward company funds in his possession, only if the request did not convey "positive and definite instructions" can Walter's disobedience be excused.

■ Walter insists that, in consideration of his broad contractual discretion, the requests for funds were merely suggestions, without hint of a mandate, but the evidence is to the contrary. On November 8, 1962, Lidstone wrote to Walter: "[s]ince we are trying to make some necessary arrangements, Bill O'Neil and I wish you to transfer to Netherlands Mead's account with the Miami Beach First National Bank that in the Chase Manhattan Bank [in St. Thomas] in excess of $15,000." Plaintiff declined to forward the funds by letter of November 16, 1962, and received two communications immediately thereafter. On November 20, Lidstone replied by letter: "I have written to you at length because I wish to emphasize that it is clearly improper for you to retain corporate funds for your personal purposes as you indicated in your November 16, 1962, letter. I therefore suggest that you transfer the funds over $15,000 to the Miami Beach account as promptly as possible. If you continue with your unreasonable refusals, you will force the directorate of Netherlands Mead to take affirmative action with respect to the bank." Then on November 21, Smeets, Managing Director of Mead cabled the order in unambiguous terms:

> Please transfer immediately all funds over fifteen thousand dollars from Chase St. Thomas to Miami Beach First National Bank for Netherlands Mead Account.

It hardly requires mention that the introductory word "please" in Smeets' cable does not detract from its mandatory character. On December 3, at a meeting of the Board

455

of Directors of the Shipping Division, Walter was again instructed to transmit the funds. The minutes of that meeting record that he was asked whether he "had complied with the instructions of the Managing Director . . ." and he replied that he had not. "The Directors then urged him to comply so that there could be no question about his cooperation." Viewing this interchange as a whole, I find that the instruction to forward the funds was "positive and definite" and consequently, Walter's violation of the order was sufficient to justify his discharge. My conclusion is reinforced, I might add, by the fact that his disobedience was not, as his own letters reveal, based on a pure and bona fide interest in the efficient operation of the ship, but rather was a reflexive move to protect what he believed to be his personal financial interests. He expressed this motivation clearly in his letter of November 16 in commenting on his dissatisfaction with the conduct of the Directors of WQF, some of whom also served on Mead's Board: "Judging from the kind of treatment I got from the Board of Directors at Walter Quick Freeze, I surely cannot expect anything different from the same men on the Board of the Shipping Division. I therefore feel that it is only prudent for me to keep a substantial amount on account of the 'Santo Antonio' until the end of this year when the statements should be made available and profits distributed to debenture holders." This motive, clearly improper and unauthorized even in the context of the broad authority he enjoyed, indicates that his disobedience was wilful and insubordinate, and standing alone would justify his immediate discharge, (9 Williston on Contracts § 1013B, p. 49). Given the firm and unequivocal nature of the order, and his basic duty of obedience, the discharge of plaintiff was unquestionably proper.

Having resolved the validity of plaintiff's discharge on the ground discussed above, I see no necessity or good

purpose to be served by reviewing other reasons relied upon by defendant in justification of its action. I turn then to another brand of discord between the parties.

## THE DEBENTURES

It was provided in the debentures, among other terms, that, if, for any reason, the holder thereof ceased to be associated with Mead's Shipping Division, the company, at its option, could redeem such debentures at face value, plus interest to the date of redemption. A further proviso was that "upon sending notice of redemption to the registered holder . . . at his registered address together with payment of such face amount and interest, such holder shall cease to have any rights hereunder." By letter dated October 19, 1963, A. A. G. Smeets, Managing Director of Mead, notified Ahto Walter that, pursuant to its right of redemption, his interest under the company debentures was terminated. The letter went on to state that company accountants fixed the accumulated interest due Walter on his six debentures at $13,412.11 up to December 31, 1962. Smeets informed Walter, however, that interest for 1963 could not be computed until he relinquished the financial records of the Santo Antonio for the months involved. Smeets promised that Walter would receive interest for that period within 90 days of delivery of those records. The Managing Director continued: "In the meantime, upon your delivering (sic) to James A. Bough of the certificates for six Shipping Division Debentures, each properly endorsed for transfer to the Corporation with all appropriate tax stamp affixed thereto, you will be delivered the Corporation's check for $10,000 representing the amount due you to December 31, 1962 ($19,412.11—$6,000 principal amount plus $13,412.11 accumulated interest as computed by the Corporation's accountants) less $9,412.11, representing the estimated amounts paid to you for your

457

account and for which the Corporation has not received detailed verified accountings or justification for such payments."

Plaintiff contends that the attempted redemption was ineffective because it failed to provide the proper payment required by the terms of the debenture. In this connection he challenges both the company's computation of the sum due him and the offset taken in accordance with the company's computation of amounts allegedly due it from him for unauthorized expenditures.

As to the base computation, three questions are presented. Firstly, the propriety of defendant's decision not to compute or tender interest for the months of 1963 which preceded plaintiff's discharge. Mead explained that such computation was impossible until Walter turned over financial records for that period, in his possession, to the company's accountants; secondly, whether the Santo Antonio was more properly depreciated over a nine year useful life as defendants did in computing profits, or an eighteen year useful life as plaintiff insists they should have done; and thirdly, should defendants have deducted a certain bad debt brought about by the embezzlement of corporate funds by Walter's successor in the sum of $20,000, in arriving at net profit for the computation of debenture earnings.

Addressing myself first to the problem of interest for the portion of 1963, prior to October 19, Mead charges that such amounts were not subject to computation or tender by reason of plaintiff's wrongful refusal to provide the necessary financial data, and excuses its failure to perform in that particular on that basis. It is evident that in order to compute profits under the terms of the debenture, Mead had to have financial data on the shipping operations which plaintiff customarily possessed. Thus, an implied condition precedent to Mead's promise to tender

458

payment of accumulated interest was Walter's cooperation in supplying the necessary information. Section 395 of the Restatement of Contracts provides that a "contractual duty is discharged by the unexcused failure of a condition to occur within the time necessary to create a right to the immediate performance of the duty." A comment to that rule is pertinent to the instant question:

> Performance of a promise frequently requires co-operation by the promisee. When this is true, the requisite co-operation is a condition qualifying the promisor's duty . . . .

Applying the Restatement rule to Mead's failure to tender interest for 1963, and to Walter's failure to provide the prerequisite data for computation of that sum, I conclude that plaintiff's refusal to co-operate excused Mead's duty in that respect. While I cannot rule that the duty to pay interest for that period is permanently excused, I do hold that failure to include that unknown amount in the tender could not, in itself, constitute a fatal flaw in Mead's attempted redemption of the debentures and termination of Walter's rights to further profit—participation.

 The problem of the proper term of depreciation to be applied in the case of the Santo Antonio was treated by accountants called by both sides. Giving due consideration to the testimony of each, I find, on balance, that the nine-year life used by Mead was too short and that an eighteen-year life would be more in keeping with sound accounting practices.

Gustav Danielson, the accountant called on behalf of plaintiff, in advancing the 18-year depreciation period, grounded his recommendation on a comparative study of the useful life of substantially similar assets (Tr. 649–651). Warren Bough, defendant's expert in this area, urged the nine-year depreciation because he felt that the refrigeration equipment was useful over that period only, implying,

I gather, that upon the expiration of the useful life of the refrigeration equipment, the entire vessel would become useless (Tr. 658). Milton Hatfield, another of defendant's accountants, though perhaps harboring doubts as to his competence to speak in this specialized field, apparently adhered to Danielson's procedure of referring to the "historical lives of similar assets". Hatfield concurred with Danielson further in suggesting that standard and accurate financial reporting dictated that an asset be amortized over its real life. (Tr. 662). And Fred H. Hallbauer, plaintiff's marine surveyor, and established as highly knowledgable as to virtually all types of bottoms estimated the reasonable life of the Santo Antonio, including equipment, to be 15 to 20 years. (Tr. 664). Moreover, as Danielson pointed out, subsequent to 1967 (Walter then being out) the depreciation rate for the Santo Antonio was modified to accord more closely with his opinions (Tr. 651). It is because of all the foregoing that I find the 18-year depreciation rate to be more probably accurate than the 9-year life advanced by defendant.

Finally, turning to the so-called "Shinnick Debt", it appears that the controversy is largely one of equity. In essence, plaintiff urges that though his successor (who Walter insists need never have been hired) indulged in thievery of corporate assets, the consequent loss is fateful retribution upon Mead for his wrongful discharge, and under no circumstances should he be penalized in Mead's company. I view the propriety of plaintiff's challenge to the redemption, however, as dependent upon the test of "standard accounting practices," and if the deduction of bad debts due to embezzlement is in accord therewith, plaintiff's invocation of a higher justice will avail him nothing.

To the extent that income tax accounting reflects common and accepted accounting procedures, it is

relevant to note that losses due to embezzlement are deductible in computing taxable income (which is comparable to net income apart from the deduction of federal taxes themselves), 34 Am.Jur. Fed. Tax § 665. Considering plaintiff's failure to offer testimony that deduction of this loss would violate standard accounting practices, and with due regard for the Treasury Department's treatment of the question, I conclude that the defendant properly made the deduction for the "Shinnick Debt".

Walter's objection to the tender by reason of the deduction of certain monies claimed by Mead, however, stands on much firmer footing. Under the terms of the debentures, the sole means by which Mead was empowered to terminate Walter's rights in them were specifically recited. Mead reserved the right to redeem each outstanding debenture upon termination of the holder's association with the Shipping Division for whatever reason, "at its face amount plus any interest the holder would be entitled to receive had [the] Debenture matured at that time." The procedure for exercising that option was also prescribed:

Upon sending notice of redemption to the registered holder of this Debenture at his registered address *together with payment of such face amount and interest,* such holder shall cease to have any rights hereunder; (italics supplied).

Although the option contemplated Walter's disassociation for any reason (which would certainly include misuse and misappropriation of, as well as failure to account for, funds), no right of offset was specifically reserved in the contractual document which Mead, itself, drafted. No citation of authority is required to posit the proposition that a document, where it is ambiguous, must be construed against its author. As the comment to Restatement of Contracts § 236(d) explains, "[s]ince one who speaks or writes, can, by exactness of expression more easily pre-

461

vent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity of language are resolved against the former in favor of the latter . . . ."

 This is not to say that Mead had no right to pursue its legal remedies with respect to the claimed monies. Certainly such a course was open from the outset. I hold merely that under the terms of the debentures, there was no room for the deductions which Mead took from the sums due to Walter in an effectual redemption terminating his rights thereunder. For this reason, I conclude that Walter's rights were not terminated in 1963 by the attempted redemption, but continued throughout the entire period of participation to January 1, 1970. Accordingly, the sums due him must be computed to include the appropriate percentage of net profits for the years preceding and following the attempted redemption, taking into account this Court's resolution of the depreciation problem, and all other adjustments, with interest thereon to the present date.

I direct my attention now to such counterclaims of Mead's as yet remain for disposition.

### FIRST COUNTERCLAIM

Mead challenges withdrawals of corporate funds by Walter to purchase traveler's checks, to pay expenses of travel and hospitalization associated with an illness plaintiff testified he contracted in Central America while on company business, and also a sum taken by Walter as vacation pay.

At trial, plaintiff testified and submitted a written exhibit to explain the withdrawals for traveler's checks on all four occasions as to which defendant's records reflected substantial expenditures therefor. On October 17, 1961, he identified the checks as drawn to cover expenses of a voyage to Holland to obtain something for the ship, and his notations indicate he submitted vouchers in that connection to Bough, Mead's counsel. On December 14, 1961, he

testified that he drew checks for expenses contemplated for a trip to Europe to locate Mr. Reynolds in an attempt to resolve certain difficulties he was encountering with the corporation, but upon failure to locate Reynolds, he stated that he refunded this sum to the corporate account. He justified his purchase of checks on July 17, 1962, as necessary for a trip to Europe to get a licensed engineer for the ship, to pay the engineer's transportation back from Europe, and to purchase something for the ship's engine. Finally, he reported that a withdrawal on December 10, 1962, was used to finance a further trip to Germany for hydraulic parts for the ship, and to purchase those parts, but his records in any case indicate refunds to the corporate account in excess of 50% of the sums so withdrawn. He expanded on these explanations, in relation to the necessity for traveling to Europe rather than communicating with suppliers by telephone, for example, by explaining that in each instance, his personal presence avoided substantial delay in securing the parts and prevented interruption of the ship's schedule.

 Under the Restatement of Agency, Second § 382 (which is applicable to plaintiff's relationship to defendant, even if it is characterized as one of master-servant, Restatement of Agency, Second § 25):

> Unless otherwise agreed, an agent is subject to a duty to keep, and render to his principal, an account of money or other things which he has received or paid out on behalf of the principal.

He is also obliged to act only as authorized, or where no instruction has been given, in accordance with reasonable customs, good faith and discretion, § 383. Both of these requirements, however—to account and not to exceed authorization—are qualified by conceptions of reasonableness. Specifically, Comment (a) to § 382 notes that an agent's "duty in these respects is satisfied if he acts reasonably in view of the business customs of the commu-

nity and the nature of his employment." Further, in explanation of the duty to act only as authorized, including expenditure of the principal's funds of course, comment (a) states:

It is only conduct which is contrary to the principal's manifestations to him, interpreted in light of what he has reason to know at the time when he acts, which subjects the agent to liability to the principal.

Walter testified, without contradiction, that he was never criticized with respect to the challenged withdrawals until the instant counterclaims were filed, although he reported the expenditures each month over the years of his employment (Tr. p. 387). Although the burden of proof rests on the plaintiff, as fiduciary, to show that the funds have been disposed of "in accordance with his authority", Restatement of Agency, Second § 382, Comment (e), that burden upon the record before me has been satisfied. It is my finding that Walter has justified his expenditures by a preponderance of the evidence, in light of the special circumstances surrounding his employment and the total absence of instruction concerning expenditures. I further find that his good faith in the challenged transactions has been clearly shown.

 I consider next plaintiff's withdrawals for medical expenses and associated expenditures. In this area there is a conflict of authority among the jurisdictions, and most cases dealing with an agent or officer's power to obligate an employer for medical expenses rendered to an employee are quite old (see annotation 71 A.L.R. 638, and cases collected). Moreover, the issue here presented is somewhat different in that most of the case law arises out of claims for compensation by the attending physicians, and many of these decisions turn on the presence or absence of a duty of care to the ill or injured party. None-

464

theless, under § 383 of the Restatement, cited supra, it is significant that plaintiff had no indication from Mead that such expenditures—assuming their business connection—were disapproved. As early as September, 1962, he had authorized such expenditures on behalf of a crew member of the Santo Antonio without objection. Indeed, at no time throughout the instant litigation has Mead suggested that it would not have authorized such payments, but merely that Walter failed to provide "the details concerning what he was doing and where he was at the time . . ." he contracted the disease (Defendant's Post Trial Memorandum, p. 17). After review of Walter's explanation of the circumstances surrounding his illness, and in light of his prior experience with authorization of expenditures for medical care of a corporate employee, I find that his conduct did not exceed his authority, and, as to this claim, that defendant is not entitled to restitution.

██ ██ Additionally, Mead objects to plaintiff's withdrawal of $2,000 as "vacation pay" on the day following dispatch of his notice of discharge. Walter attempted to justify his withdrawal of this sum as compensation for vacation due. He testified that he had not taken any vacations, aside from a single period of sick leave, during his entire employment with Mead. His right to vacation pay, completely aside from the propriety of the circumstances under which he took it, is doubtful, as I have upheld his discharge. An employee's right to such a payment is dependent upon the terms of his contract, express or implied, 53 Am.Jur.2d, Master and Servant, § 80, and this contract makes no specific reference to such a right. It fixes his salary and specifies monthly payment thereof, but it clearly leaves his working schedule to subsequent resolution, in light of the emerging circumstances. Paragraph 2 of the Contract provides in part:

During the term of this Agreement, Walter shall devote such time and energy to the furtherance of the business of the Employer as its Managing Director of the Shipping Division as may be required....

This paragraph suggests that Walter's time requirements were expected to be flexible, but it fails to express any guarantee of fixed vacation periods or pay. The implication is that if his full time attention proved necessary to efficient operations, such would be expected. The general rule, as I understand it, is that employees terminated for cause are not entitled to vacation pay, at least where their employment terminates prior to the end of the employment year, Sinnett v. Hie Food Prod., Inc., 185 Neb. 221, 174 N.W.2d 720; See generally cases collected at 91 A.L.R.2d 1078, 1087 and cf., In re Pringle Engineering & Mfg. Co., 164 F.2d 299 (7 Cir. 1947). Coupling the absence of contractual obligation to Walter to provide vacation pay with his discharge for cause, I cannot find his withdrawal of $2,000 following notification of termination to be justified even as vacation pay. Accordingly, as to this portion of defendant's first counterclaim, it is entitled to recover.

### FOURTH COUNTERCLAIM

I deal with this and the following counterclaims next inasmuch as the THIRD and SEVENTH counterclaims are taken up together.

 Plaintiff conceded in his testimony that despite defendant's demand, he had withheld records for the Santo Antonio after his discharge. He stated that he "just thought that the best thing to do was to hand them over to [his] attorney and see how he wants to handle it," (p. 196). Upon further questioning he added that there was no appropriate person representing Mead in St. Thomas to whom he could have delivered the records. This explanation, however, cannot pass muster as it is apparent that com-

munication by mail was readily available and feasible. Under the Restatement of Agency, Second § 402(1)(c), an agent (or employee) is liable to his principal for the value of a chattel which he withholds, if his principal is entitled to immediate possession thereof, or to damages for his misconduct, if he unreasonably refuses to surrender it on demand. Moreover, Comment (b) to that section indicates that harm to the principal's interests by such conduct is immaterial. Applying that rule to plaintiff's actions, I think it is indisputable that Mead demanded and was entitled to immediate possession of the records of the Santo Antonio which Mead owned and, of necessity, would continue to operate following Walter's discharge. The problem is one of fixing damages, which Mead offered no evidence to establish. According to § 331(1) of the Restatement of Contracts, damages are recoverable for losses caused by a breach of contract "only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." Failing such proof, only nominal damages may be allowed, § 328. I cannot make a reasoned estimate of defendant's losses in this regard, and I will, therefore, allow only $100 as damages for this misconduct.

### FIFTH COUNTERCLAIM

■ Mead has accused Walter of purchasing certain equipment charged to the corporate account and retaining the same. It indicts him too with transporting equipment, via the Santo Antonio, which was destined for the new supermarket he was constructing, without charging for freight. As to the chattels, Walter admitted purchase of each item with corporate funds, and retention after his discharge for personal use (Tr. 219, 272–5). His duty to relinquish these items upon demand, which he concedes, as well, was made of him, has already been alluded to

467

above. The office equipment was purchased new in 1961, and was not improperly appropriated until September, 1963, almost three years later. Thus, some depreciation must certainly have been suffered, and in the absence of evidence on the question, I think it proper to once again consult the Treasury Guidelines which the parties' own accountants cited to this Court. Those guidelines fix the useful life of office equipment and furniture at 10 years. Consequently, I presume a depreciation of 30% (3 years out of 10) for the appropriated items. The said items totalled $931.35. Defendant should recover the total purchase price of those items after deducting that percentage (30%) to reflect the value of the items at the time Mead was wrongfully deprived of their possession. A similar deduction is appropriate for the automobile, which was purchased for $2,758.17 in November, 1962, approximately 10 months prior to plaintiff's discharge. Applying a useful life of three years to that vehicle, as the guidelines prescribe, a deduction of approximately 27% is to be made to reach the value of which Mead was wrongfully deprived.

◼ As to the charges for freight space which Walter concedes he granted to a company which was supplying certain equipment for the new supermarket, in exchange for a reduction in price of that equipment (Tr. p. 290), plaintiff is unquestionably liable to defendant under § 404 of the Restatement of Agency, Second. That section makes the point that an agent (or employee) is liable to his principal for the value of the use of assets which he improperly devotes to his personal benefit or that of a third person. Mead's damages consist of the value of the converted asset which was established by testimony to be approximately $1,200 plus landing fees, but only those attributable to the improper freight—not for the total charges paid on the ship's landing (Def. Ex. V). The total recovery on this counterclaim will be $1,337.95.

468

 Mead denounces Walter for violation of the employment contract clauses prohibiting other employment and competition, pointing to his conduct in constructing the new supermarket. The first clause proscribing other employment reads:

(2) During the term of this Agreement, Walter shall devote such time and energy to the furtherance of the business of the Employer as its Managing Director of the Shipping Division as may be required and, except in connection with his employment with Walter Quick Freeze Corporation, Walter shall not act in any advisory or other capacity for any ididual, firm, association or corporation other than for the first party in any matter or matters without the prior written consent of the employer.

As to this paragraph, Mead must of necessity contend either that plaintiff acted for another firm, which would have to be Pueblo Supermarkets, in constructing the new store, or that the language prohibited him from acting "in any advisory or other capacity" even for himself personally, "in any matter or matters without the prior written consent of the Employer." This latter interpretation strains contractual language to the breaking point, and, in any event, stands in stark violation of the principles prohibiting unfair restraint of trade. Such restrictions as may be imposed by contract on the conduct of a party may not be more extensive than necessary to protect the interests of the promisee. They may not impose undue hardship upon the promisor, Restatement of Contracts, § 515. Passing on then to the argument that plaintiff acted for Pueblo in this venture, I find the record clearly to the contrary. Walter negotiated the lease of property to erect the building in late 1962 and began construction immediately thereafter, admittedly without informing defendant. In August, 1963, however, he informed O'Neil, sole stockholder of Mead, of his plans and progress, and offered the entire project to

Mead. His bona fide intention to transact a sale with Mead cannot be doubted inasmuch as on the very day he disclosed the project to O'Neil, he signed a memorandum of sale which he interpreted as binding. Moreover, it was not until after his discharge from the shipping division that he sold the market to Pueblo. On these facts, I regard it as impossible to find that Walter was acting for Pueblo in constructing the market, and accordingly, no contractual violation has been established in this respect.

██ ██ The second paragraph which defendant charges plaintiff violated reads:

(7) Walter shall not during the term of this Agreement and for a period of two (2) years following the expiration of the term provided for engage directly or indirectly or own an interest in any business which shall be in competition with the shipping business conducted by the Employer or by any subsidiary of the Employer or by any other business in which the Employer may have a controlling or substantial interest.

Walter stoutly maintains, in defense of this charge, that the paragraph prohibits his competition solely with the shipping interests of defendant or its subsidiaries, but not with other kinds of enterprises conducted by either Mead or its associated businesses. The language of the paragraph clearly comports with plaintiff's interpretation as the list of enterprises with which he is forbidden to compete are all introduced with the preposition "by", suggesting that all the ensuing names are intended to modify the preceding phrase "the shipping business conducted". Moreover, such an interpretation is consistent with the general law of agency, which enjoins agent competition with the principal only with regard to transactions connected with the agency, Restatement of Agency, Second § 393. Comment (a) provides in part that "an agent can properly act freely on his own account in matters not within the field of his agency . . . ." Walter's agency or employment

with Mead was as "Managing Director of the Shipping Division of the Employer." He clearly was not Mead's agent or employee as to his service as general manager of Walter Quick Freeze, as the parties found it necessary to specially except that employment from the sole employment clause in the contract. Thus, as to non-shipping related activities, the common law of agency would not prohibit plaintiff's pursuit of the supermarket enterprise; and as I read the contract between the parties, its terms require no more.

Based upon the foregoing findings and conclusions, Mead is not entitled to recover on its Third and Seventh Counterclaims, as any financial loss which may have resulted from Pueblo Supermarkets entering the St. Thomas market was not attributable to plaintiff's wrongful conduct.

## TENTH COUNTERCLAIM

■ Defendant accuses plaintiff of failing to adequately supervise the care and maintenance of the vessel which was among his primary responsibilities as general manager of the shipping division. Clearly, as Mead's employee, plaintiff was obligated to exercise all reasonable care to preserve the property of his employer, entrusted to him in connection with his employment, Restatement of Agency, Second §§ 402, 422. In support of this allegation, Mead offered the testimony of a surveyor who carefully inspected the Santo Antonio in November, 1963, only two months after Walter's discharge, and found the ship in what he termed "deplorable" and "unsatisfactory" condition (Tr. p. 549). As to the deficiencies which he observed and itemized in his report, defendant's expert estimated that the causal neglect would have to have been at work for four to six months next preceding his survey in order to produce the conditions then observed (Tr. p. 54). This conclusion, however, was disputed by a surveyor called by

Walter who had also carefully inspected the Santo Antonio in April, 1963, for official certification by Lloyd's Registry. He testified that as of the date of his inspection, the ship was in good condition. He stated also that the conditions found in the subsequent survey could have occurred after plaintiff's discharge and his release of the vessel (Tr. p. 602). Besides, he identified a number of items in the November survey as common or customary, suggesting that some of the deterioration could not be characterized as resulting from a breach of the duty of reasonable care.

 In any event, there is a direct conflict in the opinions of the parties' experts as to the period during which the alleged negligence must have persisted in order to produce the conditions present in November, 1963. Neither witness can be said to have substantially better credibility than his counterpart.[5] Since of necessity defendant must establish plaintiff's responsibility for the damage to its chattel by a preponderance of the evidence before it can recover, I must find and conclude that it has failed to meet its burden and recovery on Defendant's Tenth Counterclaim must therefore be denied.

Let judgment enter on the complaint and the counterclaims in accordance with the findings and conclusions hereinabove set forth, including the dismissal of claims as to which failure of proof was conceded. It is my conclusion that plaintiff has prevailed within the meaning of Chapter 45 of Title 5 of the Virgin Islands Code, and is thus entitled to recover costs and reasonable attorney's fees. In view of the contribution toward attorney's fees asked by plaintiff's counsel, the latter is directed to bring his request before the court by appropriate motion with

---

[5] As regards broad qualification and experience, I would give the nod, if pressed, to Hallbauer.

accompanying affidavits and such other documentary or other means which might justify the fee requested.