AHTO WALTER

v.

NETHERLANDS MEAD N.V. (A Netherlands Antilles Corp.)
and W. M. O'NEIL

NETHERLANDS MEAD N.V., Appellant in No. 74-1342
AHTO WALTER, Appellant in No. 74-1343

Nos. 74-1342 and 74-1343

United States Court of Appeals

Third Circuit

Argued December 2, 1974

Filed March 20, 1975

THOMAS N. DOWD, ESQ. (PIERSON, BALL & DOWD) ,Washington, D.C., *for appellant*

CHARLES S. WAGGONER, ESQ., St. Thomas, V.I., *for appellee*

Before SEITZ, *Chief Judge,* and VAN DUSEN and ROSENN, *Circuit Judges*

## OPINION OF THE COURT

VAN DUSEN, *Circuit Judge*

Netherlands Mead N.V. (Mead),[1] the defendant, and Walter, the plaintiff, appeal and cross-appeal the January 7, 1974, judgment of the district court.

This suit resulted from the disintegration of Walter's association with Mead.[2] Prior to that association, Walter and his wife, operating through Walter Quick Freeze Corporation (WQF), were in the retail food business in the Virgin Islands. In 1959, in connection with this business, Walter negotiated the purchase of a cargo ship, the Santo Antonio. Rather than purchase the ship through WQF, however, Walter entered into a complicated arrangement with Mead, a corporation owned and controlled in 1959 by Walter's friend, Reynolds. This arrangement involved four

---

[1] Mead is a Netherlands Antilles corporation. The complaint was dismissed as to O'Neil.

[2] Our statement of the facts closely tracks the district court's, but we have omitted material not relevant to these appeals. See Walter v. Netherlands Mead, N.V., 9 V.I. 438 (D. V.I. Civil No. 284-1963, 1973).

parts. Mead purchased the Santo Antonio. On January 1, 1960, WQF and Mead signed a 10-year agreement which made WQF the preferred customer of Mead's "Shipping Division," i.e., the Santo Antonio, which guaranteed Mead specified minimum gross revenues and which granted to Mead 50% of WQF's net profits. At the same time, Mead and Walter signed a 10-year employment agreement which made Walter a "Managing Director" of Mead's Shipping Division. And Walter purchased eight profit-sharing debentures from Mead, each having a face value of $1,000. Each debenture entitled Walter to 4.4% of the annual net profits of the Shipping Division.

This litigation concerns the employment contract and debentures. Some of the terms of these agreements must be set forth for an understanding of the issues. Clauses 2 and 7 of the employment agreement provided:

"(2) During the term of this Agreement, Walter shall devote such time and energy to the furtherance of the business of the Employer as its Managing Director of the Shipping Division as may be required and, except in connection with his employment with Walter Quick Freeze Corporation, Walter shall not act in any advisory or other capacity for any individual, firm, association or corporation other than for the first party in any matter or matters without the prior written consent of the employer.

• • •

"(7) Walter shall not during the term of this Agreement and for a period of two (2) years following the expiration of the term provided for engage directly or indirectly or own an interest in any business which shall be in competition with the shipping business conducted by the Employer or by any subsidiary of the Employer or by any other business in which the Employer may have a controlling or substantial interest."

In clause 3, the agreement gave Walter "sole responsibility for the management of the Shipping Division," but directed Walter to "report, as required, to a committee appointed by the Board of Directors of the Employer for its Shipping

Division." Clause 6 provided that Walter could be removed only for cause.

The debentures provided, in pertinent part:

"This Debenture is registered and is nontransferable without the prior written consent of the Managing Director of the Company. In the event the registered holder hereof ceases, for any reason, to be associated with the Shipping Division of the Company either as officer, director or employee or if the registered holder of this Debenture takes any action to sell, assign, convey, transfer or pledge his interest in this Debenture without the prior written consent of the Managing Director of the Company, the Company may, at its option, redeem this Debenture at its face amount plus any interest the holder would be entitled to receive had this Debenture matured at that time.

"Upon sending notice of redemption to the registered holder of this Debenture at his registered address together with payment of such face amount and interest, such holder shall cease to have any rights hereunder."[3]

The district court observed that the "foundation stone of these intricate arrangements was the underlying personal relationship between Reynolds and Walter, between whom there was highest confidence and respect, and who counted on the venture to succeed primarily because of this mutual esteem." 9 V.I. at 447. In 1961 Walter lost control of WQF and was dismissed as its manager in January 1962. By January of 1963, one O'Neil had acquired full ownership of Mead; by May of that year O'Neil controlled WQF as well.

As the ownership of the two companies changed, potential sources of disagreement between Walter and Mead

---

[3] Another clause of the debentures concerned the time at which interest payments fell due:

"Payment of such participating interest for the portion of the fiscal year of the Company during which this Debenture matures shall be made within 90 days of such maturity."

Redemption, it appears, requires two steps. First, Mead is required to send notice with payment of the principal and interest accrued through the fiscal year preceding the year during which redemption occurs. Ninety days later Mead is required to tender interest for the fiscal year of redemption.

became increasingly active. In November of 1962, and repeatedly thereafter, the directors of Mead requested Walter to transfer to Mead's account in Miami, Florida, all funds in excess of $15,000. which Walter maintained in St. Thomas for the account of the Santo Antonio. Walter initially responded that $15,000. was too little for the operation of the ship, adding that he lacked confidence in the directors of Mead, but finally made a substantial transfer in July of 1963. During the same period, Walter surreptitiously began the construction of a new supermarket. This project was not revealed to O'Neil until August 12, 1963, when Walter attempted to use his interest in the new market to advantage in negotiating his future relations with O'Neil.

Despite Walter's plans for the new market, the negotiations led only to his being discharged as manager of the Shipping Division on or about September 10, 1963. On October 4, 1963, Walter sold the partially completed supermarket to a competitor of WQF, Pueblo Supermarkets. On October 19, 1963, Mead's Managing Director wrote Walter a letter which attempted, pursuant to the above-mentioned clauses of the debenture, a redemption of the six debentures still owned by Walter.[4] The letter recited that Mead was exercising its right to redemption. It stated that $13,412.11 in interest had accrued on the debentures through December 31, 1962, but informed Walter that interest for 1963 could not be computed until Walter relinquished the necessary records. Thus, the total amount which Mead could compute to be due Walter was $19,412.11, representing $6,000. principal plus interest through 1962. However, rather than tendering this full amount, Mead proposed to pay Walter $10,000. upon receipt of the debentures. This latter amount represented the full amount computed, less an amount for which Mead

---

[4] Walter had sold his other two debentures to O'Neil.

claimed Walter had not properly accounted, conveniently estimated to be $9,412.11. Walter did not surrender the debentures and the $10,000. was never paid.

In December 1963, the new Pueblo market opened across the street from one of the WQF markets. WQF, which had a profit before taxes of $38,371.47 in 1963, lost $296,139.81 in 1964. Mead's 50% interest in WQF's profits suffered accordingly.

Walter filed this suit (see note above) September 20, 1963, claiming both damages due to wrongful discharge and amounts due on the debentures. Mead counterclaimed for damages resulting from Walter's alleged breaches of clauses 2 and 7 of his employment contract.[5] The case came to trial on January 10, 1970, in the District Court of the Virgin Islands. The district court's judgment was entered on January 7, 1974; it was supported by a memorandum dated March 27, 1973.[6] The court found that Walter's discharge had been proper, but awarded Walter principal and interest on the debentures through their expressed maturity date because it found Mead's attempted redemption of the debentures to have been ineffectual. The court also found that Walter did not breach clauses 2 and 7 of his employment contract when he began construction of the new supermarket. Other parts of the district court's judgment were not challenged on appeal.

## I. *The Employment Contract*

Both parties object to the district court's interpretation of the employment contract between Walter and Mead.

Walter contends that the district court erred in holding that his refusal to transfer to Mead the amounts in excess of $15,000. was a sufficient reason for his discharge.

---

[5] The pleadings contained additional claims which are not subjects of these appeals.

[6] The district court thoughtfully accounted for the litigation's longevity. 9 V.I. at 444 n. 1.

He maintains that the law of agency should control his contract with Mead, and advances three arguments for reversal under the agency rubric: first, that the directives to transfer funds were not issued by Walter's "principal;" second, that the directives were unreasonable within the meaning of Restatement (Second) of Agency § 385 (1957); third, that Mead breached the employment contract in making the demand so that any subsequent breach by Walter was excused.

■ Although we find the district court's opinion on the question of Walter's discharge to be satisfactory, we will briefly respond to each of the above contentions. With respect to Walter's first argument, the instructions to Walter were issued by Messrs. Lidstone, O'Neil, and Smeets. The district court, with its more thorough knowledge of the complex understandings between the various participants, never doubted that these men had authority to issue the instructions; instead, the court occupied its opinion with the question whether the instructions were merely suggestions. See 9 V.I. at 451–57. But Walter contends that Lidstone, O'Neil and Smeets were at best his equals in Mead, not his superiors. Walter relies, for example, on the fact that both Lidstone and he were called "Managing Directors of the Shipping Division."[7] It is true that the corporate titles for these men do not give a clue as to their comparative responsibilities. But Mead has directed our attention to minutes of a December 30, 1959, meeting of the shareholders of Mead which clarify their relative responsibilities:

"7. Proposal to approve the nomination by the Management of Mr. Ahto Walter, Mr. Ian Major, Mr. Richard J. Reynolds and Herrick

[7] Actually, Walter claims that they were both "special deputy managing directors." Appellee's Brief at 23. This designation was taken from Mr. Lidstone's testimony regarding a meeting of Mead's shareholders, the minutes of which appear to be Defendant's Exhibit B. Those minutes reveal the actual titles to have been as stated in the text.

K. Lidstone as Special Attorneys of the company in charge of the Shipping Division of the company referred to above, Mr. Walter, Mr. Reynolds and Mr. Lidstone each with the title of 'Managing Director of the Shipping Division of the Company' and Mr. Major with the title of 'Director of the Shipping Division of the Company', with the capacity in either Mr. Walter or Mr. Major to represent the Company jointly, judicially and extra judicially, in all matters concerning said Shipping Division, but only with the approval of either Mr. Reynolds or Mr. Lidstone, and with the capacity in Mr. Walter to represent the Company singly, judicially and extra judicially, in all matters concerning the routine, day-to-day affairs of the Shipping Division, such as from the day of this meeting.

.       .       .

"These proposals put to the vote, are unanimously adopted by the meeting."[8]

It was at this meeting that Mead's shareholders ratified the contracts between WQF, Walter, and Mead. These minutes are, therefore, important evidence on the parties' intent in making Walter a "Managing Director" of the Shipping Division, and in giving him "sole responsibility" for its operation. A fair reading of the minutes suggests that decisions regarding the overall management of the Shipping Division were made subject to Mr. Lidstone's approval, but the implementation of such decisions was left to Walter's sole discretion. The total amount of cash available for immediate withdrawal by Walter would seem to fall into the former category; by contrast, decisions regarding the proper disbursement of the cash for the efficient operation of the ship would be left entirely to Walter. We conclude, therefore, that at least Lidstone[9] was empowered to direct Walter to transfer funds in excess of $15,000.[10]

---

[8] These minutes were entered in the record as Defendant's Exhibit B.

[9] Since we hold that Lidstone was empowered to direct the transfer of funds, we need not decide whether O'Neil and Smeets were also so empowered.

[10] The minutes indicate that Reynolds shared Lidstone's power, but there is no indication that Reynolds objected to Lidstone's demand. It will be recalled that Reynolds was losing control of Mead during the time the directions to Walter were made; it is possible, therefore, that he was no longer in a position to object.

■■ Walter's second and third arguments have also failed to persuade us. Restatement (Second) of Agency § 385 (1957) [11] provides:

"(1) Unless otherwise agreed, an agent is subject to a duty to obey all reasonable directions in regard to the manner of performing a service that he has contracted to perform.

"(2) Unless he is privileged to protect his own or another's interests, an agent is subject to a duty not to act in matters entrusted to him on account of the principal contrary to the directions of the principal, even though the terms of the employment prescribe that such directions shall not be given."

Comment "a" to subsection (1) explains in part:

"The agent cannot properly refuse to obey on the ground that the obedience will be injurious to the principal's affairs, unless the agent's compensation is dependent upon the execution of the undertaking or unless it has been agreed that the agent's discretion shall control."

In Walter's mind, he refused to obey the instructions to transfer funds in order to protect the interests of the Shipping Division, which was entrusted to him, and on the success of which his participating interest in the debentures depended. For these reasons, he believes that the above sentence in comment "a" speaks directly to his situation. We cannot agree. Since we have found that the amount of cash at Walter's disposal was, by agreement, left to the approval of Lidstone, we hold that the parties had "otherwise agreed" for purposes of § 385, so that their contract, and not comment "a," controls. For the same reason, Mead did not breach its employment agreement with Walter when it demanded the transfer of funds. Having found that Mead's requests for the funds were authorized and reasonable, we must conclude that the district court correctly held that Mead was privileged to discharge Walter

---

[11] Where available, the Restatements have been adopted as the law of the Virgin Islands. See 1 V.I.C. § 4 (1967). On the conflict of the laws issue, see note 14 infra.

568

upon his refusal to transfer the funds. See Restatement (Second) of Agency § 409(1) (1957).

■ We turn now to Mead's claim that the district court should have found that Walter violated clauses 2 and 7 of his agreement with Mead when he began constructing the new supermarket. Mead argues, in effect, that these clauses were intended to embody Walter's duty of loyalty to Mead. Applying standard principles concerning the duty of loyalty, Mead contends that Walter should be required to account for the profits Mead lost as a result of the opening of the Pueblo supermarket.

The problem with Mead's analysis is that Walter's actions slip between clauses 2 and 7. Clause 2 does not prevent Walter from acting in his own interest, but only from working for others.[12] Clause 7 by its syntax prohibits competition only with the shipping business of Mead. Although the WQF-Mead contract linked the fortunes of the two companies, Mead also did shipping for other customers. It is, therefore, not appropriate to equate competition with WQF with competition with Mead's Shipping Division for purposes of clause 7. We find that Walter's conduct did not violate the express employment contract.

■ Even if we assume, without deciding, the Walter's conduct would violate a duty of loyalty Walter owed to the corporation as its officer[13] on common law principles,[14]

---

[12] The district court specifically found that Walter was not acting for Pueblo in constructing the new supermarket. 9 V.I. at 470. Although Mead is able to point to a damaging statement made by Walter during his testimony, Reply Brief at 6, which Walter has disputed but failed to correct under F. R. App. P. 10(e), we are not able to say that the court's finding was clearly erroneous, in light of the entire record.

[13] In general, an officer who competes with his own company will be liable in damages. Abbott Redmont Thinlite Co. v. Redmont, 475 F.2d 85, 88–89 (2d Cir. 1973). See Lincoln Stores v. Grant, 309 Mass. 417, 34 N.E.2d 704 (1941).

Walter's conduct may fall outside the rule, however. The new supermarket was not a potential competitor of Walter's employer, Mead, but only of Mead's trading partner, WQF. And Walter was not hired as an officer of Mead, nor was he one of Mead's directors; rather, he was hired as a "Managing Director" of Mead's "Shipping Division." Had the corporation

there remains the question whether the duty of loyalty was not subject to contractual modification in this very close corporation.[15] We find that it was. At the time the employment contract was made, Mead was owned by Walter's friend, Reynolds. O'Neil, who had stepped into Reynolds' shoes by 1963, was surely apprised of the terms of Walter's contract. Whereas strong principles of loyalty embody society's ordinary expectations for the conduct of fiduciaries, such principles should not prevent the shareholders of this close corporation, Reynolds and later O'Neil,[16] from entering into an agreement which, by clauses 2 and 7, re-

---

wished unequivocally to saddle Walter with the duty of loyalty, they would have made him an officer, but they chose not to do so.

[14] Presumably, the law of the Netherlands Antilles should govern the duties owed Mead by its officers and directors. However, Mead has made no effort to prove Netherlands Antilles law. F. R. Civ. P. 44.1. We shall therefore assume that the law of the Netherlands Antilles is consistent with the law of the forum. Leary v. Gledhill, 8 N.J. 260, 267, 84 A.2d 725, 728 (1951); B. Currie, Selected Essays on the Conflict of Laws 46–49 (1963). Since we have not found in the Virgin Islands Code any statutory regulation of the duty of loyalty of corporate officers and directors, and since there is no Restatement on the subject, common law principles control. 1 V.I.C. § 4 (1967).

[15] Mead cites several cases concerning the duty owed by an employee or agent to his employer or principal. For the reasons given above at note 14, the law of the Virgin Islands controls this issue; 1 V.I.C. § 4 directs us in this instance to Restatement (Second) of Agency (1957). Relevant portions of that Restatement provide:
"§ 389. Acting as Adverse Party without Principal's Consent
Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge."
"§ 393. Competition as to Subject Matter of Agency
Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency."
The Restatement thus subjects an agent's duty of loyalty to contractual modification. This is consistent with the cases cited by Mead, which did not contain a contractual provision modifying the employee's or agent's duty of loyalty. See Community Counseling Service, Inc. v. Reilly, 317 F.2d 239 (4th Cir. 1963) (implied duty of loyalty); NLRB v. Montgomery Ward Co., 157 F.2d 486 (8th Cir. 1946) (implied duty of faithfulness); Commonwealth Finance Corp. v. McHarg, 282 F. 560 (2d Cir. 1922) (implied duty of loyalty).

[16] The record evidence indicates that all shares of Mead were owned by Reynolds or O'Neil from 1959 through 1963. And it is undisputed that in 1959, when the employment contract with Walter was made, Reynolds was the sole shareholder and in 1963, when suit was filed, O'Neil was the sole shareholder, so that neither of them can complain of terms in the contract with Walter.

stricted Walter's duty of loyalty.[17] We therefore affirm the district court's holding that Walter did not breach these clauses when he began construction of the new supermarket.[18]

The product of the district court's resolution of these issues is that neither party will recover a large expectation interest under the employment contract. This aptly reflects the impasse which relations between Walter and Mead reached during 1962 and 1963. The mutual trust necessary for their continuing contractual cooperation had vanished; in retrospect, we can see that the complete failure of their arrangement was inevitable. Were we to place the blame caused by that failure on one of the parties by granting the other's expectation interest, we would distort their agreement and the mutual failure of their trust.

## II. *The Debentures*

The district court found that Mead's deduction of $9,412.11 from the amount it had computed to be due Walter through 1962 was not authorized under the terms of the debentures set forth above. It held that the attempted redemption of the debentures was, therefore, in-

---

[17] "If all the stockholders of a corporation consent, and it is not detrimental to creditors, officers may appropriate corporate assets. It follows that if there are no stockholders except the directors and officers, the latter may, of course, by unanimous consent, give away corporate property, where the rights of creditors are not impaired."
3 W. Fletcher, Cyclopedia of the Law of Private Corporations § 1104 (Rev. ed. 1965). This principle was adopted in Stony Brook Lumber Co. v. Blackman, 286 Pa. 305, 309, 133 A. 556, 557 (1926), which was recently recognized in Brown v. Presbyterian Ministers Fund, 484 F.2d 998, 1005 (3d Cir. 1973) (rights of creditors were impaired). See also Moran v. Edison, 493 F.2d 400, 405 (3d Cir. 1974) ("[I]n the case of a closely held corporation . . . where the directors are also the officers and stockholders, self-dealing on salary questions may be inevitable as a practical matter."); Clark v. Dodge, 269 N.Y. 410, 199 N.E. 641 (1936) (enforcement of agreement among sole shareholders-directors to vote for certain people as officers, which did not affect the public, was permissible despite statutory policy to the contrary).

[18] In part, the district court denied Mead relief because it found that clause 2 was an unfair restraint of trade. 9 V.I. at 469. Because we do not believe that Walter's conduct was covered by clause 2, we need not consider the restraint of trade holding.

effectual, so that Walter's rights continued through January 1, 1970, the express maturity date of the debentures. Had the redemption been effectual, Walter would have recovered something over $20,000.; instead, he recovered $137,514.71 in interest on the debentures, $6,000. principal, and $56,808.89 accrued interest from the dates on which the annual interest payments were due through March 27, 1973, the date of the district court's memorandum.

■ Mead objects to this result on several grounds. It first argues that its deduction of the $9,412.11 was within the terms of the debentures, and therefore did not defeat its attempted redemption. We agree with the district court that the deduction was improper. However, Mead also contends that any defect which the court finds in the manner of its attempted redemption should not result in liability for interest through the express maturity of the debentures. We have concluded that such contention must be granted and the district court judgment must be reversed on this issue. On this record, Walter is estopped from raising any objection to the attempted redemption other than the one which he raised in his original complaint and which he maintained consistently thereafter, namely that his discharge had been improper so that Mead had no option to redeem the debentures under the redemption clause set forth above. By including this redemption issue in the complaint, Walter was the first party to raise it.

Mead contends, and Walter does not deny, that Walter's initial written statement of position concerning the attempted redemption was his complaint in the district court. Walter's original complaint stated a cause of action for improper discharge and predicated his right to participating interest through the debentures' maturity date on the ground that his employment had been wrongfully terminated. The complaint proceeds as if Mead had already

attempted to redeem the debentures, even though the complaint was filed nearly a month before Mead sent its October 19, 1963, letter attempting redemption. One must infer that, on the basis of their strained relationships, Walter anticipated that Mead would exercise its option to redeem the debentures upon Walter's discharge, and that Walter was eager to record his claim on the debentures as part and parcel of his claim for improper discharge. Coming as it did before Mead's letter, the complaint nowhere objected to the technical defects in the October 19, 1963, letter which Walter now asserts as having made that letter ineffectual to redeem the debentures.[19]

On receipt of the October 19, 1963, letter, Walter did not amend his complaint to include his technical objections to the attempted redemption, nor did he take any other action calculated to apprise Mead of these objections. Indeed, the record indicates that Walter never thought of such objections until their possibility was raised by the

---

[19] Relevant portions of Walter's September 20, 1963, complaint read as follows:

"COMES Now the plaintiff Ahto Walter, by and through his attorneys, Maas & Ireland, Esqs., and complaining of the defendant does allege and state as follows:

. . .

"12) . . . The purported removal of the plaintiff from office as Managing Director, and from 'all association or connection with Netherlands Mead N.V.' appears to be directly calculated and intended to improperly and fraudulently deprive plaintiff of debenture income to which he is entitled under the terms of the said debentures.

. . .

"14) Further, the defendant is entitled to the protection of this Court in connection with the income due to be paid to him on the debentures he holds in the Shipping Division of the defendant. By the action of defendant the plaintiff is now unable to obtain correct information and figures of the income developing in the future from the Shipping Division of the defendant. The wrongful and fraudulent actions of the defendant have been directed toward the removal of the plaintiff from the employment for which he is eminently qualified and for which he is entitled to be reimbursed to the full amount of salary, bonus and debentures provisions. Under the terms of the debentures, plaintiff should be paid the sum of $158,400.00 for his participating interest in the net income of defendant due him for the years 1963 through 1969; . . . ."

In view of these parts of Walter's complaint, we cannot understand the basis for the dissent's statement that "Mead, not Walter, brought this issue into the case." Concurring and Dissenting Opinion at 2.

trial judge near the end of the trial, as noted below. The pre-trial materials, which, of course, extend over a six-year period during which interest on the debentures was constantly accruing, were entirely silent on the subject until plaintiff's October 1969 Statement[20] (see below) was filed. It is clear, therefore, that Walter's objection to the attempted redemption had not changed during this period from that of his original complaint. His "Statement of Factual and Legal Questions Involved," filed October 20, 1969, restated exactly the same position, that he was entitled to recover on the debentures because his discharge had been improper, as follows:

"PLAINTIFF'S STATEMENT OF FACTUAL AND LEGAL QUESTIONS INVOLVED

"We herewith consolidate for the Court all of the factual evidence and outline the state of the case and the legal issues involved. . . .

. . .

"II. THE ISSUES

"1. With respect to the non-competition provisions of the Employment Contract of January 1, 1960, are the provisions unfair, unreasonable, and unenforceable? Are they greater than required for the protection of the employer defendant; do they impose undue hardship upon the plaintiff employee; are they therefore illegal and unenforceable?

"2. Was Plaintiff improperly discharged from his position as Manager of the Shipping Division of Netherlands Mead?

"3. *If he was improperly discharged, what is he entitled to under the terms of the debentures* and the terms of the Employment Contract?

---

[20] The only non-Rule 16 document filed prior to trial we have found which dealt with the debentures was a Motion and Accompanying Affidavit, Document 47, filed by Walter on November 16, 1967. It sought access to Mead's records for the purpose of calculating Walter's participating interest on the debentures and does not reflect any alteration in Walter's theory of recovery on the debentures.

"4. If he was properly discharged, is Netherlands Mead entitled to relief under any of its counterclaims?" (Emphasis supplied.)[20a]

Document 66 at 1, 6–7. The theory on which Walter now relies, that the October 19, 1963, letter failed to comply with the method of redemption provided in the debentures, was first suggested by the trial judge, sua sponte, on January 21, 1970, after the debentures had matured (on January 1, 1970) and after plaintiff had rested his case (N.T. 671):[21]

"The Court: The next question: are you suggesting on this motion that the Court dismiss Mr. Walter's complaint in its entirety or partially?

"Mr. Rosenberg: Partially. Do you want me to elucidate on that?

"The Court: Well, the part that you don't want—that you are not suggesting a dismissal on, I think, occurs to me, that's why.

"Mr. Rosenberg: Well, he is entitled, as we suggest in our pleadings, I believe, to the earnings of the debentures prior to his discharge.

"The Court: Now, let's get to that. If we agree that there were grounds for his discharge, it is clear that the debentures say that when he ceases to be an employee his right to hold them ceases also; isn't that correct?

"Mr. Rosenberg: That's right.

---

[20a] Defendant's statement of question presented (Doc. 84) relies on the existence of sufficient cause for discharge of plaintiff by stating this question, with authorities supporting the right to defend on the facts of this case:

"QUESTIONS PRESENTED

"May an employer who is sued for breach of an employment contract defend on the ground that there existed, at the time of discharge, sufficient cause for discharge, although he was, at the time, ignorant of the facts?"

[21] One phrase in Walter's opening statement to the court may appear to raise as an issue in the manner of attempted redemption:

"We say that—and I feel that the evidence will show—that he was arbitrarily fired in violation of this contract; that his debentures were not properly redeemed under the very provisions of those debentures." N.T. 5. However, read in the light of the next sentence, "I say that the evidence will show that Ahto Walter can answer every one of these allegations that have been set forth in the answer and in the counterclaim and answer them properly and prove to you that they are not a basis for firing him for cause under the terms of the contract," N.T. 5–6, and Walter's pretrial statement of issues, it is clear that by the "provisions of those debentures," Walter meant the condition of proper discharge to Mead's option to redeem.

"The Court: Now, the debentures, however, provided how they should be redeemed. If they properly discharged him, did that relieve them of the obligation to redeem the debentures in the manner stated on the face of them?"

N.T. 710–11. The novelty of this theory was evident when, shortly after the above exchange, the district court had to correct Walter's attorney, Mr. Ireland, who still believed that Walter's claim on the debentures depended on proving that he had been improperly discharged:

"The Court: Please. And may I ask Mr. Ireland a question? I meant to ask it and forgot. Do you agree with Mr. Rosenberg that if there was in fact good cause to discharge Mr. Walter the whole case falls?

"Mr. Ireland: The whole case falls.

"The Court: Other than as to the debentures, if there is a finding that he was properly discharged, do you agree that that ends the plaintiff's case, except in this area we are discussing now?" N.T. 713.[22]

Mead contends that, in reliance on the theory first seen in Walter's complaint and maintained by Walter for six years until it was finally supplanted at trial at the district court's suggestion, it did not correct the alleged deficiencies in its tender by depositing into court the amount Walter claimed Mead owed him. Instead, Mead assumed that its obligations to Walter on the debentures would stand or fall depending on whether the court found that its discharge of Walter had been justified. A venerable case in this Circuit is directly on point:

"Accordingly, when a party, with full knowledge of the facts . . . has selected and given one of several available reasons for his refusal to perform his contract or discharge his duty and after suit changes his position and seeks to rely upon the others, federal courts in this circuit, looking to the reason of the rule and keeping in mind

---

[22] Even after the suggestion of the trial judge at N.T. 713, plaintiff's counsel did not clearly state that he agreed with such suggestion (see N.T. 713–17).

the distinction between waiver and estoppel, . . . examine the record to find whether it appears that the party has misled his adversary or induced him to alter his position to his prejudice or has himself reaped an advantage by failing seasonably to assert the defense subsequently made—in other words, whether the facts raise an estoppel. . . ."

Second National Bank of Allegheny v. Lash Corp., 299 F. 371, 372 (3d Cir. 1924) (citations omitted). See also Ohio & Mississippi Ry. v. McCarthy, 96 U.S. 258, 268 (1878).

Mead's argument is believable. The October 19, 1963, letter was not so grossly defective that Mead's reliance on it can be considered unreasonable, particularly in light of the assumption both parties shared until more than half way through the trial that Mead would be liable on the debentures through their express maturity date only if the court found that Walter had been improperly discharged. And it is difficult to believe that a profitable[23] corporation, had it been apprised that Walter objected to the manner of redemption, would not have eliminated the risk of a tenfold increase in its liability by making a corrected tender into court. Walter's only counter to this argument is that paragraph 15 of Mead's Answer filed on May 7, 1965, shows that Mead was on notice of Walter's objections to the manner of redemption.[24] But paragraph 15, copied in the margin,[25] does not argue that the attempted redemption was in

---

[23] According to Walter's (Plaintiff's) Exhibit No. 27, Mead showed a profit during the years 1960–1969, inclusive.

[24] Actually, Walter relies on Mead's Amended Answer, which was filed on July 7, 1969. However, paragraph 15 of the original Answer is identical to paragraph 15 of the Amended Answer.

[25] "AS A FIRST PARTIAL DEFENSE

"FIFTEENTH: Insofar as the complaint herein is based on plaintiff's alleged right under the 'Shipping Division Participating Debentures' owned by plaintiff (paragraphs '6', '14', and '16' of the complaint), plaintiff is estopped from asserting any claim thereunder because:

(a) By letter dated October 19, 1963 (a copy of which is annexed hereto as Exhibit 2 and made a part hereof), defendant MEAD notified plaintiff of its election to redeem plaintiff's six (6) 'Shipping Division Participating Debentures' and tendered payment in full to December 31, 1962 for such Debentures. Plaintiff, having failed to deliver his said six (6) Debentures to defendant, has waived his right to demand payment therefore. Nevertheless, defendant MEAD, having elected to redeem plaintiff's said Debentures,

577

formal compliance with the terms of the debentures, as it would have if Mead thought Walter's objection went to the manner of redemption. Although it is not explicit, paragraph 15 appears to reflect Mead's continuing belief that its obligations on the debentures had ceased as of December 31, 1962. This belief is reflected in Mead's recitations that it had elected to redeem the debentures after Walter had been properly discharged, and that Walter had failed to supply information necessary to compute interest due between December 31, 1962, and the date of redemption.[26]

For these reasons, we have concluded that the record[27]

all as provided in said Debentures, remains ready, willing and able to make the payment tendered in defendant MEAD's October 19, 1963 letter.

(b) Plaintiff, having repeatedly and improperly failed to deliver to defendant MEAD or to its accountants, Messrs. Klynveld, Kraayenhof & Co., Curacao, Netherlands Antilles, the books of accounts and statement of receipts and expenses for the period commencing January 1, 1963 to and including the date of termination of plaintiff's employment, has made it impossible to compute the profits and/or losses for such period; and, therefore, plaintiff is estopped from claiming any payment for any period after December 31, 1962 with respect to the six (6) 'Shipping Division Participating Debentures held by plaintiff.

(c) As a result of the termination of plaintiff's association with defendant MEAD on September 10, 1963 and as a result of defendant MEAD's election as aforesaid, to redeem plaintiff's 'Shipping Division Participating Debentures', plaintiff has failed to state a claim against defendant MEAD upon which relief can be granted with respect to his participation in the profits earned by the Shipping Division after October 19, 1963.

(d) If plaintiff is entitled to recover from defendant MEAD with respect to his six (6) 'Shipping Division Participating Debentures', his right to recover is limited to $19,412.11, the amount of principal and profits with respect to said six (6) Debentures as computed by defendant MEAD's regularly employed accountants, as provided in said Debentures, for the period to December 31, 1962."

We agree with the concurring and dissenting opinion that Mead had the burden or proving redemption as an affirmative defense. Our point, though, is that Walter's written statements estop him from litigating the question whether the attempted redemption was in formal compliance with the debentures' redemption procedure.

[26] Mead's payment of interest on the debentures was excused to the extent that Walter did not supply the necessary accounting information. Comment "c" to Restatement of Contracts § 395 (1932). However, as noted above, we agree with the district court that the same principle does not excuse Mead's deduction of $9,412.11, for which it claimed Walter had not satisfactorily accounted. The $9,412.11 was an amount Mead claimed Walter owed it (unless he could account for it satisfactorily), which may not be deducted from a valid tender. 15 Williston on Contracts § 1810 (3d ed. 1972).

[27] In reaching this conclusion, it has been necessary to reject a possible interpretation of one phrase in the district court's findings of fact which we have decided would be clearly erroneous. The district court said, "Walter, contending that the attempted redemption was ineffectual, declined to ac-

supports Mead's assertion of an estoppel.[28] The estoppel arose as the result of Walter's position, first stated in his September 20, 1963, complaint and maintained consistently thereafter, until the suggestion of the district court itself on January 21, 1970, that Walter's objection to the attempted redemption was that he had been improperly discharged. Since we have held that Mead's attempted redemption of the debentures on October 19, 1963, was in-

cept tender and eventually commenced this suit." 9 V.I. at 450. The evidence in the record supports that finding only insofar as it is based on Walter's contention that the attempted redemption was ineffectual because he had been improperly discharged, not because of any objection to the manner of redemption. This is, of course, consistent with our holding.

[28] Due to the steady accrual of interest from September 1963, when the Complaint was filed, the estoppel we find would have arisen with equal force if Walter's statements had been made to Mead out of court. The estoppel found in this case arises from statement in the pleadings only because, after the collapse of their relationship, Walter's communications to Mead were solely through the medium of papers filed in this district court action. Since the estoppel did not arise from the complaint as a pleading, but only from the complaint as a communication of Walter's position to Mead, we find the dissenting opinion's reliance on the Federal Rules of Civil Procedure to be misplaced. This is especially true in a case such as this, where the defense normally includible in the answer has been anticipated in the complaint. See notes 19 and 25 above.

The plaintiff's statement of issues (pages 15–16 above) was submitted pursuant to paragraph 4 of the district court's May 19, 1969, Pre-Trial Order. The plaintiff should, therefore, have been limited to the issues included in his statement, absent an order of the district court allowing the plaintiff to amend his statement. See Ely v. Reading Co., 424 F.2d 758, 763–64 (3d Cir. 1970); Southard v. Independent Towing Co., 454 F.2d 1115 (3d Cir. 1971); Payne v. S. S. Nabob, 302 F.2d 803 (3d Cir. 1962); F. R. Civ. P. 16. Although the defendant made no objection based on the plaintiff's pre-trial statement at the time the trial judge's new theory was raised, his counsel stated that he disagreed with the trial judge (N.T. 715–16). In Ely, supra, this court used this language at pages 763–64:

"One of the main purposes of the pretrial conference is to formulate the issues to be litigated to aid the parties in preparation for trial. *If counsel are permitted to change the positions taken at pretrial obviously the effectiveness of this procedure is destroyed.* For this reason the pre-trial order is generally binding on the parties. It cannot be modified without the permission of the court and a showing of manifest injustice. The decision of whether or not to permit a change is within the discretion of the trial judge. Appellate interference with this discretion should be kept at a minimum. It should only be exercised where there is a clear abuse of discretion."

(Emphasis added and footnotes omitted.) It is noted that no order was entered by the district court expanding the issues to be considered on the ground of "manifest injustice" or any other ground. In view of the accrual of interest from 1963 to the present, it seems clear that there is more injustice to the defendant, who failed to make payment in reliance on a proper discharge, than to the plaintiff, whom the trial judge made the beneficiary of a suggestion he advanced first near the end of the trial.

579

effectual, we hold that Walter is entitled to interest on the debentures through September 20, 1963, together with interest accrued through the date of judgment. So much of the district court's judgment as is inconsistent with this holding will be reversed.

## III. *Attorney Fees*

■ The district court granted Walter, as the prevailing party, $30,000. in attorney fees. It relied on 5 V.I.C. ch. 45 (1967), which at § 541 provides:

"§ 541. Costs defined
  (a) Costs which may be allowed in a civil action include:

. . .

    (6) Attorney's fees as provided in subsection (b) of this section.
  (b) The measure and mode of compensation of attorneys shall be left to the agreement, expressed or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may fix by way of indemnity for his attorneys fees in maintaining the action or defenses thereto."

Since our holding on the debenture issue substantially diminishes Walter's recovery, we must vacate the district court's grant of attorney fees and remand so that the district court can decide, in its discretion under § 541(b), whether Walter should still recover attorney fees.

Even if we had affirmed on the debentures, we would feel constrained to vacate the district court's grant of attorney fees, since the court appears not to have complied with the standards for taxing attorney fees which have been set forth in recent opinions of this Circuit. The applicable principles were recently collected and analyzed by this court in Lindy Bros. Bldrs., Inc. of Phila. v. American R. & S. San. Corp., 487 F.2d 161 (3d Cir. 1973), and Estien v. Christian, 507 F.2d 61 (3d Cir. 1975). If on remand the district court decides that Walter is still the prevailing

party for purposes of 5 V.I.C. § 541(b), it should compute the attorney fees due Walter on the basis of the criteria stated in Lindy and reaffirmed in Estien.[29]

## IV. *Conclusion*

The district court's judgment will be reversed with respect to Walter's recovery on the debentures, with instructions to enter judgment for Walter in the debentures' principal amount ($6000.00), plus participating interest accrued through September 20, 1963, plus interest on such participating interest amounts accrued from the dates the annual payments were due through the date of entry of the new district court judgment on the debentures. The district court's judgment with respect to attorney fees will be vacated and remanded for further proceedings consistent with the criteria set forth under heading III above. In all other respects, the judgment of the district court will be affirmed.

---

SEITZ, *Chief Judge*, concurring in part and dissenting in part.

I concur in the court's disposition of the issues pertaining to plaintiff's employment contract. I disagree with its reversal of the district court's ruling on the debenture issue.

The debenture issue had a bizarre procedural and substantive career in the district court. A recital of its unfortunately protracted history is necessary to an understanding of my position.

---

[29] In this case it would be particularly important to determine what portion of Walter's attorney's time was applied to the claims on which Walter has ultimately prevailed, and to grant only so much of the fees thus computed as are fair in relation to the amount of Walter's recovery on these claims.
 We note that since Lindy and Estien were decided October 31, 1973, and January 2, 1975, respectively, the district court did not have the benefit of these decisions when it wrote its memorandum in March 1973.

On September 20, 1963, Walter filed his complaint. He sought, inter alia, recovery of the face amount of the debentures for their full term (until 1970) plus interest on the theory that he had been invalidly discharged and thus deprived of the opportunity to realize the full benefit of the debentures.

On October 19, 1963, Mead sent Walter a notice of redemption.

On May 7, 1965, Mead filed its answer to the complaint and asserted "As a First Partial Defense" that Walter was estopped from asserting any claim under the debentures after the date of its redemption letter of October 19, 1963.

Whether this subject matter was properly labeled an estoppel, we need not decide. Under the terms of the Agreement, if there was a valid redemption attempt, it certainly was a defense to Walter's debenture claim for the period beyond the redemption date, assuming a legal discharge. This possible partial defense to the complaint was, of course, based on action taken by Mead after the filing of the complaint. As new defense matter to which no responsive pleading was required, it had to be taken as denied. F. R. Civ. P. 8(d). The same partial defense was repeated in Mead's amended answer filed in 1969.

The majority opinion points out that Walter did not raise the formal insufficiency of the redemption offer in his pre-trial statement. But neither did Mead mention the redemption defense in its pre-trial statement of "Questions Presented" filed in January 1970. More to the point, Mead had the burden of proving its partial defense that there had been a valid redemption. Mead, not Walter brought this issue into the case. The majority would apparently thrust this burden on Walter by requiring him to do what the Federal Rules do not require of him, viz., file

an amended pleading challenging the validity of the redemption on the ground that there was a formally defective tender.

A reading of the trial transcript shows an understandable emphasis on the issue of the validity of Walter's discharge. It is understandable because this was the only issue presented by Walter and Mead did not shoulder its burden with respect to the partial defense of redemption.

Under my analysis of the case, particularly assuming a proper discharge, redemption was a matter of defense. In these circumstances, I do not understand how the majority can use the record facts here to construct an estoppel against Walter on this issue. Absent such estoppel all agree that the redemption was invalid. Given the majority's unwillingness to allow Walter to make a claim under the debentures in this action, the court should at least conclude that the validity of the attempted redemption was not before the district court in this action.

The majority construes a statement made by plaintiff's counsel in his opening address to indicate that counsel at that time did not intend to contest the attempted redemption on any grounds other than wrongful discharge —a meaning which is not clear from the plain language of the statement. It further finds in a brief exchange on the record between the district judge and counsel for the plaintiff what it deems to be conclusive evidence that plaintiff was not aware of the possibility of attacking defendants' attempted redemption until such a course was suggested to plaintiff late in the trial.

I believe that the majority has taken the statements upon which it relies out of context and has based its conclusions on a tenuous and conjectural reading of the language. At worst either passage relied upon could be read to sustain an inference exactly opposite to that which

the majority seeks to draw.[1] At best, the quoted passages merely show that plaintiff did not in fact raise objections to the redemption attempt. But in my view, the burden of raising this defensive matter was not on the plaintiff.

Whatever value the quoted portions of the transcripts may have to demonstrate that plaintiff did not assert imperfections in the "tender," they do not help to sustain the majority's estoppel theory. The debentures actually came due on January 1, 1970, eighteen days before the commencement of trial in this case. It therefore is in-

---

[1] The portion of plaintiff's opening statement quoted by the majority is as follows:

We say that—and I feel that the evidence will show—that he was arbitrarily fired in violation of this contract; that his debentures were not properly redeemed under the very provisions of those debentures.

I find this language ambiguous, and nothing in preceding or subsequent portions of the pretrial statement elucidate exactly how plaintiff proposed to show that the debentures had not been properly redeemed. However, inasmuch as defendants brought the redemption issue into controversy, it could well be that counsel was merely indicating that plaintiff was prepared to rebut defendants' affirmative defense.

A continuation of the portion of the exchange between defense counsel and the court quoted by the majority follows. I find it to demonstrate that defendants understood and intended the redemption issue to be defensive matter about which they had yet to make an offer of proof.

THE COURT: Now, the debentures, however, provided how they should be redeemed. If they properly discharged him, did that relieve them of the obligation to redeem the debentures in the manner stated on the face of them?

MR. ROSENBERG: Well, I submit, your Honor, they made an attempt to redeem them. Of course, this is not yet all fully in the record. That is still to come out on our side, how this is done.

THE COURT: Well, then if I take that evidence in the light most favorable to him, then he would have made out a case which would cause us to go forward as to more than just debenture profits up to '63.

MR. ROSENBERG: I think there is evidence in the record that an attempt was made to redeem them.

THE COURT: I know, but not in accordance with the terms of the debentures.

MR. ROSENBERG: Well, I'm not sure that counsel has spelled that out and proved that it was done.

THE COURT: He doesn't have to, for the reason the letter—there is a letter from somebody telling him we have computed thus and so and if you will give your debentures to somebody—

MR. ROSENBERG: Yes.

THE COURT: —we will give you this amount of dollars which represents what the debentures are now worth, less what we estimate you owe us.

MR. IRELAND [Walter's counsel]: It's Smeet's letter.

THE COURT: That's the letter, and I'm asking you the fact if we concede that they had good cause to discharge him did that relieve them of the obligation to take into the debentures in the manner in which it says it was to be taken in?

appropriate to imply that statements or representations made by plaintiff during the trial mislead defendants, preventing them from protecting their interests, since there was no act that defendants could then perform that would have prevented the debentures, retroactively, from reaching fruition.

The majority asserts that plaintiff never amended his complaint nor undertook any action to inform defendants of his technical objections to the tender. But the majority cites no authority for the proposition that plaintiff had a duty to amend his complaint.

Nor is Second National Bank v. Lash Corp., 299 F. 371 (3d Cir. 1924), controlling here. The majority relies on Lash for the proposition that plaintiff is estopped from now asserting that the debentures were never properly redeemed since he never put defendants on notice that their supposed tender was imperfect at the time it was made.

But Lash is clearly distinguishable. Lash applied the estoppel principle to prevent the use of contract defenses available before suit but not cited in the answer, preventing what was essentially a deceptive trial tactic. The case involved a suit against one party to a contract who was seeking to evade his contractual obligation which, because of market fluctuations, had become disadvantageous to him. The contract sued under was bilateral, containing mutual promises—by the plaintiff, that he would tender goods in accordance with the terms and conditions of the contract, and by the defendant, that he would accept goods properly tendered and make payment for them. The plaintiff tendered substantial performance. The defendant rejected the tender and affirmatively represented that there was only one basis for his rejection. He was subsequently prevented from introducing for the first time at trial his other objections to the tender.

The case at bar, however, differs substantially. Here, the defective tender ground was based on an act—the tender—that had not yet occurred when plaintiff filed his complaint; there is therefore no basis for concluding that plaintiff withheld from his complaint available grounds for an attack on the tender in order to deceive defendants. Here the party against whom the majority applies the estoppel principle is seeking to enforce—rather than to evade—a contractual obligation, to gain no more than the benefits that flow by operation of that contract.

Here also the debenture agreement required merely unilateral acts: once Walter's employment was terminated Mead need only have sent notice of redemption together with payment of the amount due under the debentures, and Walter's rights would have been extinguished automatically, without any action by Walter. Moreover, here, at the time of the offer of tender, Walter took no action, made no affirmative representations about the sufficiency of the offer, and made no additional statements about the substantive aspects of the case until he filed his pretrial Statement of Issues on October 20, 1969, approximately two months prior to the time the debentures came due in full.[2]

Finally, in this case Mead's acts so flagrantly violated the debenture redemption provisions that it cannot be said that Mead offered substantial performance. When one contracting party is bound to tender a given performance, and he attempts a tender by offering performance which is sub-

---

[2] In fact, upon receipt of the letter-offer, Walter was silent. He clearly did not comply with the terms of the offer—by turning over his debenture certificates—nor did defendants seek to compel him to comply. Under such circumstances it might be said that Walter had absolutely rejected the offer and that his silence was without prejudice to his later assertion of grounds for his rejection. See 5 Williston on Contracts § 744 at p. 526, where, in a passage quoted with approval, it is stated:

But when the buyer has absolutely rejected the goods, for whatever reason, his silence as to other objections which would justify his refusal to accept, when unaccompanied by conduct which may have misled and prejudiced the vendor, cannot be construed as a waiver of the buyer's right to insist on his plea of non-performance on those grounds.

stantially different from that contemplated in the contract, his attempted tender should be construed as an offer to reform the contract that gives rise to no obligation on the part of the offeree to accept, and that, if left unaccepted, is utterly ineffectual. Smeet's letter of October 19, 1963, was exactly that—an offer of reformation that was never accepted by Walter. Stated differently:

In order to constitute a valid tender, the tenderer must offer a specific amount. While such amount need not be beyond dispute, nothing short of an offer of everything that the creditor is entitled to receive is sufficient, and a debtor must at his peril tender the entire sum due, . . ., and a mistake in tendering an amount less than the sum due is the misfortune of the tenderer, the tender having no legal significance if refused, and the position of the parties remains the same as though no tender had been made. 86 C.J.S. Tender § 7 at 562.

An offer of performance, it seems to me, is not a valid tender unless made in good faith. Mead's demand that Walter surrender the debenture certificates, and its deduction of an amount that it deemed as owed the company by Walter, when compared with what was actually required of Mead under the debenture redemption provision, clearly demonstrate that Mead's redemption attempt was not made in good faith. Consequently, its offer of performance did not constitute a valid tender.[3]

Moreover, given the substantial and obvious manner in which the offered performance was deficient, it is clearly implausible that defendants could have, in good faith, believed the redemption attempt to be valid or that plaintiff could have misled them to so believe.

The estoppel principle is therefore inapplicable under the facts of this case. The judgment of the district court

---

[3] It should be noted that the debentures involved in this case could not have been transferred by Walter without the prior written consent of Mead, therefore there is no possible justification for Mead's demand that Walter surrender his certificates before he would be allowed to recover the amounts due as there might have been had the debentures been negotiable instruments.

587

should be affirmed except as to the attorney fee issue. Alternatively, in reversing that portion of the district court judgment which dealt with the redemption issue, the majority should state that its decision is without prejudice to plaintiff's right to bring a separate action under the debentures.